Harry **ASHLEY**, Plaintiff,

v.

**UNITED STATES** of America,
Defendant.

**Civ. 0839.**

United States District Court
D. Nebraska.
March 6, 1963.

Thomas A. Walsh, Omaha, Neb., for plaintiff.

Russell J. Blumenthal, Asst. U. S. Atty., Omaha, Neb., for defendant.

VAN PELT, Judge.

This case is brought under the Federal Tort Claims Act. Plaintiff seeks damages for injuries to his right arm and for expenses incurred in connection therewith resulting from a bite by a bear while he was on a trip with his family through Yellowstone National Park.

The questions presented can be stated as follows:

1) Is the United States of America absolutely liable to a person not a trespasser, injured in a national park by wild animals, under the doctrine relating to one who owns, keeps or harbors dangerous animals?

2) What standard of care is to be applied as to a vistor to a national park who has paid the vehicle fee required for entrance?

   a) Is the standard to be applied that of the State in which the national park is located?

   b) Was plaintiff an invitee or a licensee? It is not claimed that plaintiff was trespassing.

3) Does the Federal Tort Claims Act require a showing of negligence by a specific or named employee of the government as distinguished from a showing of negligence on the part of defendant's park employees generally, or some of them, in failing to adequately warn visitors to keep their car windows closed in the vicinity of bears?

   a) Should the court receive in evidence an amended pamphlet (Exhibit 20) warning park visitors to roll up their windows when bears approach when action to add the warning had been initiated before Plaintiff's injuries but the amended pamphlet not received until afterward.

4) Was the failure to warn plaintiff to keep his car windows closed alone, or combined with the failure to remove or kill the bear thought to be the one that bit Mr. Ashley the proximate cause of the injury?

5) Was plaintiff guilty of contributory negligence barring a recovery?

6) Did plaintiff assume the risk of injury by a bear

   a) when he entered the park in an automobile knowing there were bears in the park; or

   b) when he took sufficient Benadryl to cause sleepiness and went to sleep sitting in the front seat of his automobile on the right hand side with the window rolled down and with a part of his arm or elbow resting on the window ledge?

7) Did plaintiff suffer injury and damage, and if so, the amount of his damage? For reasons hereafter shown, we do not reach all of these questions.

The facts are not in serious dispute. Plaintiff is a rancher in northwest Nebraska. With his wife and three boys aged ten, eight and six, he went to Wyoming on a cattle buying trip. Having completed his business, they proceeded to take a trip through Yellowstone Park, at the suggestion of the boys. They drove to Cody, sometimes known as the east entrance to the park and stayed there all night. The following morning, June 29, 1958, they entered the park. Prior to leaving Cody, plaintiff, who had suffered through the night with hayfever, took a "good swallow" of Benadryl, which his wife, a registered nurse, had brought along for the boys, who were also hayfever sufferers.

At the park entrance, plaintiff, who was driving, paid the $3 vehicle admission fee. He received with the receipt (Exhibit 1) the usual bulletins consisting of a booklet about the park containing general information including comment relative to bears (Exhibit 3), and a leaflet which had the word "Dangerous" printed on its face in bold red type just above a large picture of a bear (Exhibit 2). This leaflet stated that bears cause many injuries to visitors and that regulations prohibit feeding or molesting them and directs visitors to watch them from a safe distance. The booklet, Exhibit 3, on page 3, with reference to the black bear, says that they are the visitor's greatest delight and the ranger's biggest headache, mentions their begging piteously for something to eat, says "stay away from them", refers to the park regulations prohibiting feeding, teasing or molesting them in any way, states that as many as 115 Yellowstone visitors received medical treatment in a single year for wounds resulting from feeding and familiarity with the bruin that is too close, and cautions "set your camera, take your pictures *from inside the automobile,* and go on your way."

These documents were read aloud by plaintiff's wife as they entered the park. As plaintiff drove, he saw some bears but did not stop. He became sleepy and pulled to the side of the road and asked his wife to drive. He then seated himself on the right of the driver in the front seat. The three boys were in the rear seat. He read the folder and leaflet which his wife had read aloud, including Exhibit 2, slid down in the seat, closed his eyes, pulled his hat somewhat over his eyes, and went to sleep.

He awoke with the car stopped, feeling severe pain in his right arm, he looked and found his elbow in a bear's mouth. The details of extracting the elbow from the bear's mouth are unimportant but he did get free from the bear. However, the arm was severely lacerated and the ulnar nerve was dangling. Neither his wife nor the three boys saw any of this occurrence. The wife first learned of it when plaintiff said to her "You've got to take me to a hospital." When she asked "Why", plaintiff said he had been bitten by a bear.

At the time of the injury the car was stopped in a line of traffic and three or four cars' lengths in front of it on the driver's side in the roadway were two bear cubs which the wife and three boys, who had "piled to the driver's side" in the back seat, were watching.

Plaintiff was given first aid at an emergency station and was then taken to a nerve surgeon at Great Falls, Montana, where he was hospitalized and his arm operated upon. He has suffered permanent injury to his right forearm and hand.

Plaintiff's argument and claim centers about the fact that Exhibits 2 and 3 did not warn plaintiff and other visitors, and they were not otherwise warned that "when bears approach, move on if you can; be sure and close your car windows." This language is not original with the court, with plaintiff or plaintiff's counsel, but is contained in Exhibit 20, which was offered in evidence and as to which the court reserved ruling. Exhibit 20 is the leaflet now used in Yellowstone in lieu of Exhibit 3. It has paragraphs relating to the black bear somewhat similar to Exhibit 3 and in part verbatim with Exhibit 3, but there has been added in heavy black italics "When bears ap-

proach; move on if you can; be sure and close your car windows." In November, 1957 the acting superintendent of Yellowstone National Park, instituted action to add on page 3 of the park folder the following: "Be sure to close your car windows when watching bears." When the 1958 revised issue of the park folder was received in August, 1958, it contained on page 3 the wording above quoted: "When bears approach, move on if you can; be sure and close your car windows."

■ Plaintiff's counsel concedes arguendo that the changing of conditions or making of repairs following an accident cannot be shown in evidence for the purpose of showing negligence, but says that Exhibit 20 should be received to show defendant's employees' knowledge of the inadequacy of their warning and to show that they were negligent in not warning plaintiff to roll up his windows when bears approached or when near bears. The court concludes to receive Exhibit 20, this being a trial to the Court. Builders' Steel Co. v. Commissioner, 8 Cir., 179 F.2d 377, supports this conclusion.

The evidence also shows that in the years 1953 to 1959 there were a total of 402 injuries from bears in Yellowstone National Park and that 296 of these occurred to persons inside vehicles. Carol O. Edwards, a district ranger in Yellowstone National Park since 1958, testified that any hungry bear was dangerous; that they are an animal that cannot be domesticated and no matter how much training a bear gets it is a dangerous wild animal. He stated that before June 29, 1958 he knew of a female bear with two cubs which frequented the area where Ashley was hurt, that she was increasingly more bold, and that she was less wary of human beings. He further stated that he had no knowledge of this bear's being dangerous, and that by "being bold" he meant she was less afraid of human beings.

Another ranger, Mr. Coleman, testified to the destruction of the mother of these two cubs, and the making of a report of the injury to Ashley in which he stated, "this bear was the subject of numerous aggressive actions against persons, including Chief Ranger Brown and the Ranger Patrolman [and that an] attempt was made to trap her which was unsuccessful, whereupon she was shot." In explaining this statement, he said that he made it to get clearance to kill the bear, and that it is not easy to establish the right to kill bears. He testified that rangers have to have a good reason before doing so; that he knew that there had been a report that the chief ranger had a ruckus with a bear in that vicinity; and that he didn't know that the bear which bit Ashley had bitten anybody else.

The above is a summary of the testimony relating to Ashley's injury and the claimed omissions of the government.

■ The plaintiff relies upon the familiar rule applied in most states which holds one who owns or harbors inherently dangerous animals absolutely liable for such damage and injury as they may cause. In support of his position the plaintiff cites the portion of 28 U.S.C.A. § 1346(b) which is quoted, infra, and argues that if a private citizen would be absolutely liable for harboring a bear, so is the United States. This contention must fail for several reasons. Section 1346(b) provides that the district courts shall have jurisdiction of a claim based on "the negligent or wrongful act or omission of any employee of the Government (under circumstances where a private person guilty of the same act or omission would be liable)." This negatives any inference that the United States is to be held absolutely liable; the legislative history of the act contains no such suggestion. See Dalehite v. United States, 346 U.S. 15, 44, 45, 73 S.Ct. 956, 97 L.Ed. 1427. Neither is there anything in the legislative history of the statutes pertaining to the national parks to indicate that the United States is to be held absolutely liable for any loss or damage resulting from the operation of the parks. This argument of the plaintiff is self-defeating. Since there is no provision for jurisdiction to hear

claims based on absolute liability this court could not hear this action if that were the only basis on which plaintiff bases his claim.

Private persons have a choice as to whether to harbor wild and dangerous animals and they are informed that in certain situations they will be held absolutely liable for any damage or injury caused by such animals. The defendant is in a somewhat different position; the public interest in maintaining parks like Yellowstone, where the land is preserved in its undisturbed state and wild animals are found in their natural habitat, outweighs any interest plaintiff may have in holding the defendant as an insurer of the safety of visitors in bear country. The defendant made the choice to set aside the park land not for any selfish or personal reason, as is the case with private individuals, but for the good of the entire public, including the plaintiff.

The only other cases which have come to the attention of the court involving injuries by wild animals in national parks, Claypool v. United States, S.D. Cal., 98 F.Supp. 702, and Williams v. United States, E.D.Mich., unreported, reached the same conclusion.

The court concludes that the United States is not absolutely liable to a person such as plaintiff, injured in a national park by a wild animal and is not an insurer of the safety of park visitors.

The answer to question 2(a) is clear. The law of Wyoming should be applied in determining negligence, contributory negligence and assumption of risk because that is the place of the injury. See 16 U.S.C.A. § 457; Buchanan v. United States, 8 Cir., 305 F.2d 738, and Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492.

We next turn to an examination of the Wyoming law to determine plaintiff's status, and the standard of care required. The Wyoming cases seem to establish three categories for persons on the premises of another, namely, trespassers, licensees and invitees. Some of the Wyoming cases discuss business in-

vitees. See Dudley v. Montgomery Ward & Co., 64 Wyo. 357, 192 P.2d 617; Loney v. Laramie Auto Co., 36 Wyo. 339, 255 P. 350, 53 A.L.R. 73. It is not claimed that plaintiff was a trespasser. It remains to be determined whether he was a licensee as the government claims or an invitee as plaintiff claims.

The National Park System has been created by an act of Congress. 16 U.S.C.A. § 1. It provides in part that the purpose of the national parks " * * * is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." The Act establishing Yellowstone National Park provides that it is "dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people." 16 U.S.C.A. § 21. Section 22 authorizes the Secretary of Interior to make regulations providing for "the preservation, from injury or spoliation, of all timber, mineral deposits, natural curiosities, or wonders, within the park, and their retention in their natural condition" and permits the erection of buildings "at such places in the park as may require the erection of buildings for the accommodation of visitors. He shall provide against the wanton destruction of the fish and game found within the park, * * *." Section 26 forbids the killing of wild animals in the park "except dangerous animals, when it is necessary to prevent them from destroying human life or inflicting an injury", and further authorizes the Secretary of Interior to make rules and regulations for the protection of the animals in the park. Section 36 provides for the giving to zoos, etc., of the surplus animals, including bears, from Yellowstone Park.

We thus have the creation of these parks containing wild and dangerous animals, sometimes in surplus quantities, and the authority for the building of buildings to accommodate visitors to the park, the distribution of circulars such

as Exhibits 3 and 20 to assist visitors coming to the park to enjoy it, the furnishing of accommodations within the park, as shown by plaintiff's Exhibit 20, column 24, the providing of services, including meal service to visitors in the park, the providing of religious services, transportation, etc. See columns 25 and 26 of Exhibit 20.

■ The court makes these comments in support of the conclusion that under Wyoming law plaintiff and all others lawfully entering Yellowstone National Park are not trespassers or licensees, but are invitees and in determining the standard of care which the defendant owed to plaintiff it is to be determined by the standard of care owed in Wyoming to an invitee.

■ The conclusion that the plaintiff was an invitee at the time of the injury is well supported by Honan v. Moss, 359 P.2d 1002. There the Wyoming Supreme Court held that the guest of a customer in the defendant's filling station was an invitee. The customer's guest was injured when he fell into the grease pit while looking for the rest room. The court quoted with approval the following from J. C. Penny Co. v. Robison, 128 Ohio St. 626, 193 N.E. 401, 403, 100 A.L.R. 705:

> "The rule is succinctly stated in Cooley on Torts, Vol. 2, page 1259 (3d Ed.) viz.: ' * * * When he (the owner or lessee) expressly or by implication invites others to come upon his premises, *whether for business or for any other purpose*, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.' " (emphasis added)

There can be no question but that the government invites the public to come into Yellowstone Park to enjoy its beauty and facilities; this is the reason it was set aside as a national park. Wyoming law does not require that an invitee enter upon the premises for business purposes, using business with its usually pecuniary connotations; it approved the above language "for business or any other purpose." Under Honan, supra, it seems clear that plaintiff was under Wyoming law an invitee. In Williams v. United States, E.D.Mich., unreported, decided October 6, 1961, it was held that a visitor to Glacier National Park, who had taken temporary employment, was an invitee.

The court agrees that the payment of the $3 fee is not controlling as to the status of park visitors. The $3 fee represented by Exhibit 1 is for an automobile permit and is at most a weak factor to be used in determining plaintiff's status. This court does not rely upon it in determining plaintiff's status.

In determining the standard of care, we must first examine the Federal Tort Claims Act, which is comprised of several sections of Title 28, and which gives this court jurisdiction in a case of this kind. It fixes liability on the United States for negligence of an employee acting in the scope of his employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 1346(b).

It is interesting to note that neither the state courts of Wyoming nor the United States District Court sitting in Wyoming has ever passed upon the questions involved in this case or upon the standard of care owing to a person injured in the park. The state courts, of course, would not have jurisdiction of such suits against the United States. The United States District Courts in the Southern District of California and in the Eastern District of Michigan, Southern Division, as shown by the cases hereinafter mentioned, have discussed this matter.

It is thus necessary to examine the Wyoming cases and make a finding as to the standard of care the Wyoming Supreme Court would apply. In Loney v. Laramie Auto Co., supra, the court held

the plaintiff was a business invitee and stated:

"A person who invites another to come on his premises, upon a business in which both are concerned [is under a duty to keep the premises reasonably safe for such invitees]." (255 P. 351)

See also the language quoted from Honan, supra, to the effect that the one inviting "must exercise ordinary care and prudence to render the premises safe for the visit."

In another recent case, Fisher v. Robbins, 78 Wyo. 50, 319 P.2d 116, which arose out of a barroom fight, the Wyoming court, although it held the defendant not liable, recognized that an especially high degree of care is sometimes owed invitees and that patrons of establishments like bars where fights are likely to occur are owed a duty greater than that ordinarily owed invitees at other public places.

The court finds that the plaintiff was an invitee and that under the Wyoming law the defendant owed to plaintiff a duty to use ordinary and reasonable care to keep the premises reasonably safe for his visit and to warn him of any hidden danger.

The court is of the opinion that plaintiff's injury is not proximately attributable to a failure to exercise ordinary care, as discussed above, on the part of the defendant, and that even if park employees had breached this duty in certain respects, to be discussed below, plaintiff may not successfully base his claim on those acts or omissions. Therefore, the court need not decide whether contributory negligence or assumption of risk on the part of the plaintiff bar recovery.

First, we consider the claimed negligence attributed to the defendant and its agents by plaintiff. The court does not find that the rangers in the area were aware prior to the plaintiff's injury that the bear which caused the plaintiff's injury, assuming it to be the mother bear with two cubs which Ranger Coleman thought it to be, was dangerous to the safety of park visitors or employees, or more important that it would make an unprovoked attack on an automobile or on a passenger in it. The court assumes at this point for purposes of this discussion that the bear was not prompted to approach or bite the plaintiff by the action of the Ashley boys in throwing bread or cookie crumbs out of the car, and assumes that the attack was unprovoked. There is conflicting evidence on the question of whether the boys had fed the cubs.

We have set forth above the testimony relating to the she bear, mother of two cubs, which probably bit Ashley, and of her destruction. The court is not surprised that Ashley in answer to his counsel's question said he did not know the sex of the bear which bit him. It is inferable from the testimony that the incidents involving the bear prior to the plaintiff's injury resulted because she and the cubs caused bear jams as opposed to unprovoked attempts to injure persons. The court concludes that the government was not negligent in failing to remove the bear to the back country or in failing to kill her before the Ashley injury.

The court further finds that the handling of a troublesome bear, which had not shown an inclination to harm visitors or park employees without first having been provoked, involves the exercise of discretion on the part of the rangers, and particularly the district ranger. The exercise of such discretion, even if abused, and the court does not believe that it was in the instant case, can not be made the basis of a claim under the Federal Tort Claims Act.

Section 2680 of Title 28 says in part:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the

failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Title 16 U.S.C.A. § 26 prohibits the killing, wounding or capturing of any wild animal "except dangerous animals, when it is necessary to prevent them from destroying human life or inflicting an injury * * *."

36 C.F.R. §§ 1.2 and 1.9 are regulations which describe proper control and care of animals in somewhat more detail; insofar as pertinent here, they do not add materially to Section 26 of Title 16 above quoted. As these provisions make clear, the decision to take action against a bear or any other wild animal involves the exercise of discretion.

The United States Supreme Court in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, when discussing § 2680 said:

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a casual step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." (pp. 35 & 36, 73 S.Ct. p. 968)

In Dalehite, the Court held that acts done by government employees in connection with the manufacture of ammonium nitrate fertilizer pursuant to a basic plan prepared by the field director of ammunition plants, including bag labeling, determining bagging temperatures, coating of fertilizer and bagging as well as the drawing of the basic plan itself were within the protection of the discretionary function rule (pp. 39–42, 73 S.Ct. p. 971). Control of bears within the basic policy plan set out above involves as much discretion.

Removal of silt and other deposits from irrigation canals under government control, which removal caused water in ponds on plaintiff's land to empty into the ditch, has been held to involve the exercise of discretion within the meaning of Section 2680. United States v. Gergory, 10 Cir., 300 F.2d 11. Whether a mental patient can be discharged from a hospital without an attendant was held to involve the exercise of discretion. Smart v. United States, 10 Cir., 207 F.2d 841. As was said in White v. United States, E.D.Va., 205 F.Supp. 662, 668:

"The discretionary function or duty referred to is not limited to a high level function involving planning. It includes any discretionary function, whether involving high level planning or other high level discretionary operations or low level operations or decisions and whether involving planning or split second choices."

As the Supreme Court in Dalehite recognized, it is often difficult to decide whether Section 2680 applies. Concededly many of the cases construing Section 2680 involve functions which are more obviously of a discretionary nature, but the court is of the opinion that a good deal of discretion is involved not only in formulating a policy balancing the interests of the safety of visitors and employees in a national park and of preserving the wild animals in their natural state for the benefit of the public, but also in the making of decisions effectuating the basic plan.

The plaintiff also contends that defendant was negligent in failing to give the plaintiff a more adequate warning concerning bears than was given and that this negligence was a proximate cause of the injury. The court is of the opinion that no such failure on the part of defendant caused plaintiff's injury. The plaintiff was told that bears were dangerous and that any attempt to feed or molest them was dangerous. Plaintiff argues that the government should have used a warning such as the one used beginning in August, 1958 warning visitors to roll up their windows if bears approach. The court is of the opinion that such warning to one of plaintiff's age and maturity should be unnecessary. In any event such a warning would not have prevented the plaintiff's injury. The record clearly establishes that no one in the Ashley car saw the bear approach, and it follows that there would have been no opportunity to roll up the window.

If it is contended that the park service should warn visitors to keep their car windows rolled up the entire time they are in the park, or in bear country, which for the visitor unfamiliar with the park would be practically the same, such contention is rejected. Experience has undoubtedly taught the park personnel that such a warning, given on a nice day such as the one on which plaintiff was injured, would fall on deaf ears. Were the park service to attempt by regulation to force visitors to take such a precaution, enforcement would, as a practical matter, be impossible. The court does not believe that such a warning need be given by the rangers in carrying out their duty to exercise ordinary care as discussed above. Neither do we believe that the rangers should have been expected to anticipate and warn plaintiff against an unprovoked attack upon an auto and its occupants, assuming the attack on Mr. Ashley was of that nature. The testimony of defendant's witnesses shows that, with rare exceptions, such attacks do not occur.

The two other cases mentioned above involving injuries inflicted by wild animals in national parks should be discussed. In Claypool, supra, the plaintiff had inquired of a ranger as to whether it was safe to camp out and sleep in a tent. The ranger knew that shortly before the inquiry bears had raided a camp in the area and injured several campers as they slept. The ranger did not tell the plaintiff of the raid but instead told him that bears never attack a camp without provocation. Thereafter, the plaintiff camped out and was injured by bears as he was sleeping in a tent. The United States was held liable. This court agrees that the ranger there was negligent and distinguishes the case on that basis.

In Williams, supra, the plaintiff who had just accepted employment from the Glacier Park Company, an independent contractor concessioner in the park, asked the manger of the company to suggest some hikes and also asked whether he would be safe from bears in taking them. The manager told him of some trails including the one on which plaintiff was later injured, and said that plaintiff had more to fear from the Indians than from wild animals and that the bears would not bother him if he did not feed, molest or otherwise provoke them. The court held that the manager had apparent authority to bind the government and that the statement had been negligently made. The court said that even without the imputed negligence, it found the defendant negligent in giving the impression to the plaintiff that he could hike on the trails in safety as long as he did not feed or molest the bears. In that case the court was of the opinion that the statement was untrue and that the government should have given better warning to hikers. The judge deciding the Williams case emphasized the difference between warnings to persons on trails and warnings to those on the roads in their cars. This court recognizes the validity of the contention that more detailed and adequate warnings should be given to hikers than to persons in cars in that they should be told that occasionally a bear will make an unprovoked at-

**48**

tack. That question, however, is not involved in the instant case.

The court concludes that actionable negligence is not shown on the part of the defendant. It follows that the failure to warn was not the proximate cause of the injury. A discussion of contributory negligence and assumption of risk thus becomes unnecessary.

It is also unnecessary to answer question number seven above, except to say that plaintiff has suffered serious, painful and permanent injuries, and if recovery was to be awarded the amount of recovery, including large medical and hospital expense, would be substantial.

An order will be entered denying and dismissing plaintiff's claim.