**Julie CARLSON and James Carlson, Appellants,**

v.

**STATE of Alaska, Appellee.**

**No. 3919.**

Supreme Court of Alaska.

Aug. 24, 1979.

---

Michael J. Schneider, Elliott T. Dennis, Johnson, Christenson & Glass, Anchorage, for appellant.

Sanford M. Gibbs, Hagans, Smith, Brown, Erwin & Gibbs, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

BURKE, Justice.

This case involves a bear attack. The issue is whether the State of Alaska may be held liable for personal injuries inflicted by a bear, when the bear is attracted to the site of the attack by garbage that had accumulated on state-owned property. The superior court granted summary judgment in favor of the State on the ground that the State was immune from liability under the Alaska Tort Claims Act, AS 09.50.250. We conclude that the State was not immune under the Act and that, depending on the facts to be established, the State may be liable for personal injuries resulting from the attack. We therefore reverse the decision of the superior court and remand the case for further proceedings.

### I. Facts

On the evening of October 22, 1975, appellant Julie Carlson was attacked and mauled by a bear at the Robe River turnout at Mile 2 of the Richardson Highway near Valdez. The Robe River turnout is a state-owned roadside area built and designed for tourist use. It was equipped with six to ten

fifty-five gallon drums, without lids, for use as litter barrels. The Carlsons lived in a camper which had been removed from their pick-up and placed on the ground in a rented space. They had lived there for about six months. Every day the Carlsons drove the pick-up truck from the camper space and parked it at the Robe River turnout. From there they rode a bus into town. The turnout was the closest available parking area to the bus stop.[1] In the mornings the turnout was usually full of cars belonging to people who caught the bus, but in the evenings, by the time the Carlsons returned from town, there were usually only one or two cars there. The State and the City of Valdez were apparently aware that the turnout was used for such parking.

On the day of the attack, the Carlsons had had to park some distance from the road, next to the litter barrels. The barrels were running over, and garbage and trash were scattered around on the ground.[2] The attack occurred as the Carlsons were walking to their pick-up truck from the bus-stop in the evening. As they crossed the turnout toward their truck, a bear appeared. It threw James into the woods then attacked Julie. Julie was severely wounded, suffering a broken leg and lacerations on her back, and it appears that she now may be suffering permanent partial disability.

The Carlsons filed a suit for damages against the State of Alaska.[3] Their basic contention was that the State was negli-

gent in allowing garbage to accumulate at the turnout, since it knew that there were bears in the area, and it knew or should have known that garbage would attract bears and pose a danger to people who used the turnout. They also alleged that the State was negligent in failing either to warn users of the turnout of the danger of bears or to fence the area to keep bears out or to take other measures to protect the users of the turnout. The State pled as affirmative defenses (1) that Julie Carlson was comparatively negligent and (2) that the State was protected by sovereign immunity.

The superior court granted the State's motion for summary judgment. The court had before it undisputed evidence that it was the State's normal practice to cease all litter barrel pick-up at roadside turnouts around October 1 and that pick-ups at the Robe River turnout had been discontinued around October 1, 1975, in accordance with that practice. The court reasoned that the State's decision regarding maintenance of highway turnout areas was a discretionary function for which the State was immune from suit under AS 09.50.250(1).[4] Following denial of their motion for reconsideration, the Carlsons filed this appeal.

## II. Discretionary Act Exception

The first issue that we address is whether, on the undisputed facts of this

---

1. These facts are clearly established in the record by sworn testimony, and they are not disputed.

2. In her deposition Julie Carlson stated: "It [the truck] was parked on the shoulder of the road right by the garbage cans. Well, you couldn't see the garbage cans because there was garbage all over them but I am sure there must have been cans there." In his report on the bear attack, a Fish and Wildlife official described the turnout: "At 11:30 p. m. the area of the incident was checked, and it was found that all the garbage cans had been full to overflowing and had been knocked over, spreading garbage over a 50 foot square area."

3. The Carlsons also sued the City of Valdez, but the City is not involved in this appeal.

4. AS 09.50.250 provides in pertinent part (emphasis added):

Actionable claims against the state. A person or corporation having a . . . tort claim against the state may bring an action against the state in the superior court. . . However, no action may be brought under this section if the claim

(1) is an action for tort, . . . and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused . . ..

Subsection (I) above constitutes the "discretionary acts exception" which is at issue in this case.

case,[5] the State was entitled to summary judgment as a matter of law. Rule 56(c), Alaska R.Civ.P.; *Moore v. State,* 553 P.2d 8, 15 (Alaska 1976).

The evidence which was before the trial court pertaining to the State's decision not to pick up trash at the Robe River turnout established the following facts: The State had entered into an agreement with the City of Valdez under which the City agreed to service the litter barrels at five locations, including the Robe River turnout. For this service the State agreed to pay the City one hundred fifty dollars per month for two pick-ups per week at each location. This agreement, however, terminated October 1, 1975, apparently in accordance with the State's normal practice. The State's responses to interrogatories submitted by the Carlsons provided the following information:

1. Was the State of Alaska, or any departmental subdivision thereof, responsible for garbage pick up at the Robe River turnout, approximately Mile 2 of the Richardson Highway, on or about the 22nd of October, 1975?

ANSWER: As far as can be determined, garbage pick-up at Mile 2 of the Richardson Highway was disbanded around October 1, 1975, and the only State agency responsible for garbage pick-up at Robe River turnout after this time would be the Department of Highways. It is normal practice to cease all litter barrel pick-up at roadside turn-offs around October 1 of each year. No other State agency is responsible after that date as far as we can determine.

.     .     .     .     .

8. Does the State of Alaska have any Standard Operating Procedures relating to the removal of refuse, or to the State's obligations or standard procedures relating to the maintenance of roadside areas where garbage customarily accumulates?

ANSWER: Not to our knowledge.

Despite the "normal practice" of not picking up turnout trash after October 1, the State did pick up the trash at the Robe River turnout two days after Julie Carlson was attacked by the bear.

The standards for applying the discretionary act exception of the Alaska Tort Claims Act[6] have been extensively discussed in three cases: *Jennings v. State,* 566 P.2d 1304 (Alaska 1977); *State v. I'Anson,* 529 P.2d 188 (Alaska 1974); *State v. Abbott,* 498 P.2d 712 (Alaska 1972). In those cases we adopted and reaffirmed the planning-operational test, under which decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational in nature are not considered to be discretionary acts and therefore are not immune from liability. *See, e. g., State v. I'Anson,* 529 P.2d at 193.

The distinction between planning decisions and operational decisions does not depend merely on *who* made the decision. Rather the distinction is based on the *type* of decision that is being made, examined "within an analytical framework which is sensitive to the policies underlying the discretionary function or duty exception." *Id.* The reason for preserving sovereign immunity for certain acts of the State is the necessity for judicial abstention in certain policy-making areas that have been committed to other branches of government. *Id.* In *I'Anson,* for example, we held that the State's failure to properly mark and stripe a portion of a highway at a campground entrance did *not* come within the discretionary act exception because "functions of this nature do not involve broad basic policy

---

5. There are also *disputed* facts in this case, but they relate primarily to the extent of the State's knowledge of the presence of bears at the Robe River turnout. Those facts are not material to the issue of the applicability of the discretionary act exception. It is only the existence of issues of *material* fact which precludes the granting of a motion for summary judgment. *See Alaska Airlines, Inc. v. Sweat,* 568 P.2d 916, 930 & n.20 (Alaska 1977). The *material* facts in this case, those relating to the discretionary act exception, are not disputed.

6. AS 09.50.250(1), set forth in note 4 *supra.*

decisions which come within the 'planning' category of decisions which are expressly entrusted to a coordinate branch of government." *Id.* at 193–94. Similarly, in *Abbott* we held that the State's failure to maintain a highway adequately in the winter was *not* within the exception because decisions on how to maintain a highway "simply do not rise to the level of governmental policy decisions calling for judicial restraint." 498 P.2d at 722 (footnote omitted). We recognized that the initial decision whether to maintain highways in the winter at all is a policy determination but held that the subsequent decisions on how that policy was to be carried out were *operational* decisions, aimed at implementing the *policy* decision. *Id.*

■■ We believe that the reasoning in *Abbott* is controlling here. The State's decision on the broad question of whether to maintain highway turnouts in the winter at all is indeed a policy determination that cannot give rise to tort liability. However, the decisions made pursuant to that policy, on how to implement it—that is, decisions on how to *cease* maintenance—are operational decisions. As to these the State is under a duty to act with reasonable care. Thus, for example, a decision not to remove the litter barrels from the turnout after October 1 when trash pick-up was discontinued was an operational decision, not a policy decision. If the State negligently implemented the decision to cease trash pick-up at the Robe River turnout, the discretionary act exception to the waiver of sovereign immunity does not shield the State from liability. We therefore reverse the decision of the superior court.

### III. Another Possible Ground for Affirming Judgment

■ Although we have determined that the decision of the superior court was incorrect as a matter of law, we may nevertheless uphold that decision if there is any other ground which, as a matter of law, would support the result reached by the superior court. *Stordahl v. Government Employees Insurance Co.,* 564 P.2d 63, 67

n.16 (Alaska 1977). We therefore must consider the other possible ground for summary judgment which is presented by the record and determine whether there is any basis for affirming the judgment. *See Moore v. State,* 553 P.2d 8, 21 (Alaska 1976); *Ransom v. Haner,* 362 P.2d 282, 285 (Alaska 1961).

The ground urged by the State in support of its motion for summary judgment, both in the superior court and on appeal to this court, was stated as follows:

It is clear that the only basis for a cause of action against the state of Alaska must come from a duty flowing from its inherent possession or control of all wild animals within its dominion, and for its failure to properly control such animals. However, liability for animals *ferae naturae* has never been recognized unless, somehow, those animals have been reduced to the possession of a particular person or agency.

The State's statement of the law is probably correct, but it is inapplicable to this case. The State appears to have misconstrued the basis for the Carlsons' allegation of negligence. The Carlsons do not contend that the State was liable simply because of its "inherent possession or control" of wild animals; their theory of negligence is that the State created a dangerous situation, that it knew the situation was dangerous, and that it failed either to correct the situation or to warn people of the danger. The State's conceded lack of control over the attacking bear, therefore, provides no basis for affirming judgment in favor of the State.

### IV. State's Liability for Damage Caused by Wild Animals

■ Since the State's conduct in this case is not within the discretionary act exception to the waiver of sovereign immunity in the Alaska Tort Claims Act, it is subject to review under the "ordinary principles of negligence." *See Webb v. City and Borough of Sitka,* 561 P.2d 731, 733 & n.9 (Alaska 1977). In *Webb* we adopted the following rule:

A landowner or owner of other property must act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk.

*Id.* at 733 (footnote omitted). Whether particular conduct is reasonable under the circumstances is generally considered a question of fact for the jury. It is therefore ordinarily not an appropriate issue for determination on a motion for summary judgment. *Id.* at 735. Since the case at bar also presents several unresolved questions of fact,[7] it is particularly necessary that it be submitted to a jury for determination.

There is a surprising dearth of case law—not only in Alaska but also in other states and in the federal courts—on the issue of liability for damage caused by a wild animal when the animal is not under the control of the defendant. The parties have not cited and this court has been unable to locate *any* case with facts precisely analogous to those of the case at bar. The few cases that have considered similar facts, however, appear to agree that, if a landowner knows that a wild animal is creating a dangerous situation on his property, he has a duty either to remove the danger or to warn the people who may be threatened by the danger.

The most helpful case appears to be *Wamser v. City of St. Petersburg,* 339 So.2d 244 (Fla.App.1976). *Wamser* involved a lawsuit against a city by a swimmer who had been attacked by a shark at a city-operated beach. The court held that, because the danger was not reasonably foreseeable, the city had no duty to guard the swimmer against a shark attack or to warn him of the possibility of such an attack. The city also was found to have no duty to seek information about the frequency of sharks in the beach area, since no shark attacks had ever occurred at the beach so as to indicate the necessity for obtaining such information.

Similarly, in *Mann v. State,* 47 N.Y.S.2d 553 (Ct.Cl.1944), the State was found not liable for damages to a car caused when a deer ran across the highway. The court held that the State could not be held liable for failure to erect fences or post warning signs where plaintiff did not allege that the State had actual or constructive notice of a dangerous situation. *See also Morrison v. State,* 204 Misc. 222, 123 N.Y.S.2d 105 (Ct. Cl.1952) (where deer crossing highway creates hazard, State may have duty to post warning signs).

There are several cases involving visitors to national parks who were attacked by bears. *Claypool v. United States,* 98 F.Supp. 702 (S.D.Cal.1951), involved a park visitor who was injured by a grizzly bear in Yellowstone National Park. The visitor had asked a park ranger if it was safe to camp in a particular campsite. Although a bear had raided that particular campsite only a few days earlier injuring several people, the ranger assured the visitor it was safe to camp there. *Id.* at 703. The court found that the government had a duty to warn under the circumstances. *Id.* at 706.

In contrast, the government was found not liable for another Yellowstone bear attack in *Rubenstein v. United States,* 338 F.Supp. 654 (N.D.Cal.1972). In this instance the visitor had been given the usual warning brochures on the dangers of bears, and park officials had no specific knowledge of bears in the area of the campsite where the attack occurred. The court held that the government could not be held liable for the completely unforeseeable actions of wild animals. *See also Martin v. United States,* 564 F.2d 1355 (9th Cir. 1976), *cert. denied,* 432 U.S. 906, 97 S.Ct. 2950, 53 L.Ed.2d 1078 (1977); *Ashley v. United*

7. For example, the extent of the State's knowledge of the presence of bears at the Robe River turnout is in dispute. There was considerable evidence of bears in the general area. The State however, points out that there was no evidence that the State had specific knowledge of the presence of bears at the turnout itself.

*States,* 215 F.Supp. 39 (D.Neb.1963), *aff'd per curiam,* 326 F.2d 499 (8th Cir. 1964).[8]

These cases suggest some of the factual questions which remain to be resolved in the case at bar. It will be necessary to decide, for example, the extent of the State's knowledge of the presence of bears at the Robe River turnout; whether it was reasonably foreseeable that a bear would attack a person who was using the turnout; and whether the State had sufficient knowledge of danger so as to give rise to a duty to post warning signs. These questions and possibly others must be resolved by the finder of fact.

REVERSED and REMANDED for trial.

---

[8]. For other cases involving injuries caused by wild animals, see *CeBuzz, Inc. v. Sniderman,* 466 P.2d 457 (Colo.1970) (customer bitten by spider in grocery store); *Williams v. Gibbs,* 182 S.E.2d 164 (Ga.App.1971) (gasoline station customer injured while running from rattlesnake); *Overstreet v. Gibson Product Co., Inc. of Del Rio,* 558 S.W.2d 58 (Tex.1977) (customer bitten by rattlesnake in grocery store).

These cases involve the liability of a business proprietor to a customer. This is a situation which, under traditional principles of tort law, imposes a stricter duty than mere reasonable behavior. Findings of liability in these cases, however, do not appear to depend on this higher duty, so these cases still provide some guidance in Alaska where the reasonable person standard applies in all cases. *See Webb v. City & Borough of Sitka,* 561 P.2d 731, 733 & n.9 (Alaska 1977).