IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT NASHVILLE

_____

JOHN F. NICHOLS AND
KERRY L. STEWART,

      Plaintiffs-Appellees,

Vs.

METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON
COUNTY,

      Defendant-Appellant,

STATE OF TENNESSEE,

      Defendant-Appellee.

Davidson Circuit No. 89C-3148

C.A. No. 01A01-9509-CV-00393

FILED

July 12, 1996

Cecil W. Crowson
Appellate Court Clerk

_____

FROM THE DAVIDSON COUNTY CIRCUIT COURT

THE HONORABLE HAMILTON V. GAYDEN, JR., JUDGE

John C. Lyell, II, of Nashville
For Plaintiffs-Appellees

James L. Murphy, III, Director of Law,
Department of Law of the Metropolitan
Government of Nashville and Davidson County
John L. Kennedy of Nashville
For Appellant

Charles W. Burson, Attorney General and Reporter
Rachel L. Steele, Assistant Attorney General
For Appellee, State of Tennessee

*AFFIRMED AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**DAVID R. FARMER, JUDGE**

      This appeal arises out of an automobile accident which occurred in Nashville at the four-way intersection of Charlotte Avenue and Eakin-Weakley Drive (Seventh Avenue North) on October 24, 1988. Plaintiffs, John F. Nichols and Kerry L. Stewart, filed suit against defendant,

Metropolitan Government of Nashville and Davidson County (Metro), for personal injuries sustained in the accident. They also filed claims with the Tennessee Claims Commission against the State of Tennessee. Subsequently, the claims commission cases were transferred for trial to the circuit court and consolidated for trial with the plaintiffs' actions against Metro in the circuit court.

With respect to Metro, plaintiffs' complaint alleges that on October 24, 1988, there was a traffic signal light "down" at the intersection of Eakin-Weakley Drive and Charlotte Avenue. The complaint alleges that because the traffic signal was down, Billy C. Stair, a state employee, crashed into plaintiffs' vehicle at approximately 6:15 p.m. The complaint avers that Metro was negligent because of the failure of its employees to promptly warn of the downed traffic signal and to provide proper traffic control after having notice of the dangerous condition created by the "downed" signal. The complaint further avers that the negligence of Metro's employees was a direct and proximate cause of plaintiffs' injuries.

Metro's answer admits that the traffic light at the intersection was down, admits that there was a collision at the intersection, and joins issue on the remaining allegations of the complaint. Metro avers that the negligence of Billy Stair, in conjunction with the negligence of the plaintiffs, was the proximate cause of the collision and the resulting injuries. Metro further avers that the decision not to provide emergency relief at the intersection was a discretionary act for which immunity from suit is preserved by T.C.A. § 29-20-205 (1980).

The intersection of Charlotte and Eakin-Weakley is controlled by traffic signals in all four directions. Plaintiff Kerry Stewart was driving her vehicle westbound on Charlotte Avenue when her vehicle was struck by Billy C. Stair who was traveling southbound on Eakin-Weakley Drive. At the time of the collision, the traffic signal controlling westbound traffic on Charlotte was green, and the traffic signal controlling southbound traffic on Eakin-Weakley was inoperative due to an accident prior to the accident in this case. Immediately prior to the accident in this case, Mr. Stair was exiting Eakin-Weakley Drive[1] and was on his way home from work. Mr. Stair is an employee of the State of Tennessee, and at the time of the collision,

---

[1] Eakin-Weakley is not a "through street," rather it leads to parking lots on the side of the state capitol building.

2

he was driving an automobile owned by the State of Tennessee.

Plaintiff Stewart testified that there were no warning signs indicating that the traffic light for Eakin-Weakley was inoperative, and that Stair's automobile appeared suddenly and that there was no chance to avoid him. Mr. Stair testified that he was familiar with the area and the intersection since Eakin-Weakley was his normal and customary route to and from work. Mr. Stair also testified that he did not slow down at the intersection of Charlotte and Eakin-Weakley, because he thought he had a green light. He further testified that he did not notice that the traffic light controlling Eakin-Weakley Drive was missing, and that his view of westbound traffic on Charlotte Avenue was obstructed by a wall along the northeast corner of Eakin-Weakley.

Approximately two hours prior to the accident involving the plaintiffs, a tractor-trailer struck the pole which held the traffic signal facing Eakin-Weakley Drive.[2] The Metro Police dispatch records indicate that a call was received at 4:17 p.m. from a dispatcher at the Metro Transit Authority regarding an accident involving a tractor-trailer at Seventh Avenue North and Charlotte.[3] The call from the Metro Transit Authority dispatcher to the police dispatcher indicated that there were no personal injuries, thus, the police dispatcher "assigned [the call] a lower priority relative to a personal injury accident." The Metro Police dispatch records contain no indication that the Metro Transit Authority dispatcher notified the Metro Police dispatcher that the traffic signal was "downed." The police dispatcher testified that she called out a dispatch at 4:37 p.m. and that there was a response and arrival at 4:41 p.m. Apparently two officers answered the call but took no action and left the scene at 4:41 p.m. and 4:43 p.m. One of the two officers who was originally dispatched to the intersection, Daniel Crockett, was again dispatched at 5:10 p.m. Officer Crockett arrived at the intersection at 5:25 p.m., whereupon he investigated the scene, wrote out the accident report, and left the intersection with three directions of traffic controlled (by signal). The fourth direction of traffic, which, prior to the

[2] Eakin-Weakley is on the north side of Charlotte Avenue and becomes Seventh Avenue North once a motorist crosses Charlotte Avenue traveling south.

[3] The Metro Transit Authority dispatcher placed the call to the police dispatcher after receiving a call from a Metro bus driver who reported that there had been an accident at the corner of Seventh Avenue North and Charlotte Avenue. The bus driver apparently did not mention that the traffic signal had been knocked down.

accident, was controlled by the signal facing Eakin-Weakley, was left uncontrolled. Officer Crockett left the intersection without directing traffic, without putting up warning signs, and without directing anyone else to put up warning signs. Officer Crockett testified that he did not stay to direct traffic, because traffic on Eakin-Weakley was very "light." He testified that the training he received at the police academy regarding inoperative signals was to personally direct traffic when volume was heavy and when he felt direction was necessary, "but not to do so when traffic flow was light or non-existent." Officer Crockett testified that in a downed signal situation, standard police procedure was to notify the county-wide dispatcher of the inoperative signal; the county-wide dispatcher would then notify Metro Traffic and Parking employees that a signal was in need of repair. Officer Crockett further testified that although he did not recall contacting either the county-wide dispatcher or Metro Traffic and Parking, he was sure he contacted one of the two because that was standard procedure. The record indicates that Metro Traffic and Parking did not receive notification that the signal was out of service until 9:50 a.m. on October 26, 1988, two days after the accident involving the plaintiffs, and then only after reviewing the accident report that was filed by Officer Crockett concerning the tractor-trailer accident that knocked down the pole.

Terry Grissim, a Metro Traffic and Parking employee who repairs traffic signals, testified that a "knock-down" situation in which one traffic light is down at a four-way intersection and the remaining three directions are left controlled, is a "dangerous condition." Mr. Grissim testified that a "knockdown is . . . [a] top priority." Mr. Grissim testified that it was his normal procedure to maintain a log of his repair activities, and he testified that he maintained this log on October 24, 1988. He stated that whenever he received a call regarding an inoperative signal, he noted the time of the call and the location of the inoperative signal in his log. The log was introduced into evidence and showed that Mr. Grissim had been repairing traffic signals all day on October 24th, and that he received no notification of the downed light facing Eakin-Weakley. Mr. Grissim stated that it would normally take approximately eight hours to re-erect a downed pole and install a new light, and that he did not have the equipment to erect a temporary stop sign at the intersection of Eakin-Weakley and Charlotte Avenue. However, he also stated that if he had been notified of the downed signal, he could have placed the remaining intersection signal

4

lights "in a flash operation."

Ernest Clark Poteete, the Superintendent of Operations at Metro Traffic and Parking, stated in his deposition that Metro Traffic and Parking has methods of providing alternate traffic control during a period of signal failure, including putting the signals on flash and having someone direct traffic.

At the conclusion of the nonjury trial, the trial court found Metro and the State each fifty percent at fault for the plaintiffs' injuries, and the court entered judgment for Nichols in the amount of $30,000.00 and for Stewart in the amount of $180,000.00. Only Metro has appealed. Metro's first, second, and fourth issues are interrelated and will be considered together. As stated in Metro's brief, these issues are:

> 1. Whether the trial court's findings of negligence against the metropolitan government are supported by a preponderance of the evidence?
>
> 2. Whether the trial court's conclusion of negligence against the metropolitan government and/or assignment of comparative fault are clearly erroneous?
>
> 4. Whether the discretionary function immunity from tort liability applies to a decision of a metro police officer regarding manual traffic direction?

The Governmental Tort Liability Act, T.C.A. § 29-20-101 *et seq.* (1980 and Supp. 1995) is premised on absolute immunity for governmental entities except as specifically removed by the Act. *See Collier v. Memphis Light, Gas & Water Div.*, 657 S.W.2d 771 (Tenn. App. 1983); *Pate v. City of Martin*, 586 S.W.2d 834 (Tenn.App. 1979). T.C.A. § 29-20-205 (1980) provides in pertinent part:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury:
>
> (1) Arises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused . . . .

Metro contends that following the first accident, Officer Crockett's decision to answer another call rather than stay at the intersection and direct traffic was discretionary rather than operational, because official police policy provides an officer with discretion to direct or not direct traffic

depending upon the officer's assessment of the traffic volume or flow.[4] Metro further contends that although a police officer may normally be considered an operational employee, there are instances in which an operational employee is entitled to discretionary immunity. Metro asserts that Officer Crockett's decision to answer another call rather than stay at the intersection and direct traffic involved a balancing of policy considerations and was, therefore, discretionary.

In *Bowers by Bowers v. City of Chattanooga*, 826 S.W.2d 427 (Tenn. 1992), our Supreme Court, in adopting the "planning-operational" test for determining what decisions are discretionary, stated:

> Under the planning-operational test, decisions that rise to the level of planning or policy making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational are not considered discretionary acts and, therefore, do not give rise to immunity. *See Carlson v. State*, 598 P.2d 969, 972 (Alaska 1979). The distinction between planning and operational depends on the type of decision rather than merely the identity of the decision maker. *See id*. We caution that this distinction serves only to aid in determining when discretionary function immunity applies; discretionary function immunity attaches to all conduct properly involving the balancing of policy considerations. Therefore, there may be occasions where an "operational act" is entitled to immunity, where, for instance, the operational actor is properly charged with balancing policy considerations. *See United States v. Gaubert*, 499 U.S. ___ , 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)(recognizing that operational activities grounded in policy are entitled to discretionary function immunity).

*Id*. at 430-31.

Although the *Bowers* Court stated that discretionary immunity may attach in some instances to the acts of an operational actor, the Court also cautioned that discretionary immunity does not "automatically attach to all acts involving choice or judgment," because "to some extent, every act involves discretion." *Id.* at 431. When considering whether an act is a planning or operational act, courts should focus on the decision making process and the propriety of judicial review of the resulting decision. *Id*. The *Bowers* Court stated:

> If a particular course of conduct is determined after consideration

[4]The testimony at trial established that Metro Police policy allows an officer to leave an intersection with a disabled traffic light as long as the traffic volume is "light."

6

or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules. (citation omitted)

On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational acts are those ad hoc decisions made by an individual or group charged with the development of plans or policies. These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. In other words, "the discretionary function" exception [will] not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation." *Aslakson v. United States*, 709 F.2d 688, 692 (8th Cir. 1986).

*Id*.

The policy of the Metro Police Department in an inoperative signal situation is that if traffic is heavy an officer should stay and manually direct traffic; if traffic is light the officer is free to leave and answer another call. Officer Crockett assessed the traffic flow, determined that it was light, and left the intersection. While Metro's policy regarding manual traffic direction in a downed signal situation may be unwise or even negligently formulated, the adoption of the policy is a discretionary function, and Metro may not be held liable when one of its police officers properly complied with this policy. Thus, no liability may be imputed to Metro simply because Officer Crockett left the accident scene because the traffic was "light."

Liability may be premised, however, on the intersection's "dangerous condition" and the officer's decision to leave without placing a call to Metro Traffic and Parking or to the county-wide dispatcher. T.C.A. § 29-20-203 (Supp. 1995) provides:

(a) Immunity from suit of a governmental entity is removed for any injury caused by a defective, unsafe, or dangerous condition of any street, alley, sidewalk or highway, owned and controlled by such governmental entity. "Street" or "highway" includes traffic control devices thereon.

(b) This section shall not apply unless constructive and/or actual notice to the governmental entity of such condition be alleged and proved in addition to the procedural notice required by § 29-20-302 [repealed].

The discretionary function exception does not apply to proceedings under this section. *Helton*

*v. Knox County*, No. 03-S-01-9502-CV-00015, slip op. at 16-17 (Tenn. May 13, 1996). A municipal corporation has a duty to maintain its streets in a reasonably safe condition and the exercise of this duty requires "exercise of ordinary care to keep . . . streets in a reasonably safe condition for travel day and night in the customary modes by persons themselves exercising reasonable care." *Bryant v. Jefferson City*, 701 S.W.2d 626, 626-27 (Tenn.App. 1985)(quoting *Blackburn v. Dillon*, 189 Tenn. 240, 243, 225 S.W.2d 46, 47 (1949)). In determining the liability of municipalities for dangerous conditions on public streets, ordinary principles of negligence apply. *Bryant*, 701 S.W.2d at 627.

The trial court found that once the traffic light controlling southbound traffic on Eakin-Weakley was knocked down, the four-way intersection became an "immediate hazard, a dangerous condition . . . ." The court found that once Officer Crockett became aware of the disabled traffic light, the intersection became a "defect in a roadway" for purposes of the Tennessee Governmental Tort Liability Act.

In *Bryant v. Jefferson City*, 701 S.W.2d 626 (Tenn. App. 1985), this Court noted that:

> Courts generally hold that where a municipality has actual or constructive notice that a stop sign is down, the city's negligence in failing to restore the sign is determined by the issue of whether the city had a "reasonable time to effect repairs." *Smith v. Godin*, 61 Ill.App.3d 480, 18 Ill. Dec. 754, 378 N.E.2d 218 (1978). What constitutes a "reasonable time" to make repairs will vary according to the facts of each case. *Bowen v. Riverton City*, 656 P.2d 434 (Utah 1982).

*Id.* at 627.

While the case before us does not involve a "downed stop sign," the same effect is presented by a downed traffic signal. It would appear that the word "repairs" provided for the in the above general rule would include any type of temporary measure taken to alleviate a dangerous condition before actual repairs can be commenced. In the case at bar, the officer testified that "department policy" was to notify the "county-wide dispatcher" of an inoperative signal, and that the county-wide dispatcher would then notify Metro Traffic and Parking so that repairs could be commenced. Officer Crockett testified that this policy was in place for "safety reasons . . . [t]o get the pole back up or get the traffic light to work." Although the officer testified that he notified either Metro Traffic and Parking or the county-wide dispatcher of the

8

downed signal because "that's pretty much standard procedure," he admitted on further questioning that he had no independent recollection of notifying either the county-wide dispatcher or Metro Traffic and Parking. Officer Crockett also acknowledged that there was nothing in his accident report to indicate that he had in fact made such notification. Ernest Clark Poteete, a supervisor at Metro Traffic and Parking, testified that all calls concerning inoperative signals are documented by the time, date, and identity of the caller. The records of the department were introduced into evidence, and there was no record of any call received on October 24, 1988, regarding the inoperative signal at the intersection of Charlotte and Eakin-Weakley. Mr. Grissim, who was on call repairing signals on October 24, 1988, testified that he never received a call regarding an inoperative signal at the intersection. He also testified that if such a call had been received by his department, he would have been notified because a "knock-down" is a top priority.

The proof established that the dangerous condition of the intersection was exacerbated by stone retaining walls on the northeast corner of the intersection and the fact that the intersection is at the crest of a hill.[5] Due to the walls and the contour of Charlotte Avenue, westbound traffic on Charlotte (plaintiffs' direction) is entirely obscured from the view of southbound traffic on Eakin-Weakley (Billy Stair's direction), and vice-versa. These factors contributed to the danger of the intersection, and they were either known or should have been known by Officer Crockett when he investigated the accident. Reasonable care under similar circumstances would require at least some steps to alleviate the danger presented by the intersection before leaving the intersection. Furthermore, Officer Crockett's testimony indicates that his determination that traffic flow was "light" was unreasonable, because at the time Officer Crockett investigated the accident (5:25 p.m on a Monday in downtown Nashville), "a lot of people are leaving town . . . ."[6]

The record supports the appellant's contention that the pole and light could not have been replaced prior to the accident in question. However, the record indicates that had Metro Traffic

---

[5]The northeast corner of the intersection is occupied by the state capitol building.

[6]Officer Crockett apparently determined that traffic was "light" based only on the number of cars in the parking lots surrounding Eakin-Weakley Drive.

and Parking been notified of the downed signal, Metro Traffic and Parking could have taken measures to alert motorists of the dangerous condition of the intersection, and that these measures could have been implemented prior to the accident in this case.

In summary, Officer Crockett's failure to notify the county-wide dispatcher of the inoperative signal and his decision to leave the intersection (a busy, downtown, four-way intersection in which westbound and southbound motorists were obscured from each other's vision) with three directions of traffic controlled and one direction of traffic uncontrolled, constituted negligence. Moreover, after notice of the condition, Metro had a reasonable time to effect some repairs or provide some type of warning and/or some type of traffic control. Mr. Grissim testified that had he been notified of the "knockdown" it would have been his "top priority," and he could have placed the remaining signal lights "in a flash operation." Mr. Grissim testified that once he arrived at the intersection, it would have taken him approximately five minutes to place the lights on flash. The record indicates that had Mr. Grissim been notified of the inoperative traffic signal at or near the time Officer Crockett was dispatched (5:10 p.m.) or when Officer Crockett arrived to investigate the intersection (5:25 p.m.), Mr. Grissim or another Metro Traffic and Parking employee would have placed the traffic signals facing Charlotte Avenue and Seventh Avenue on flash prior to the accident in this case.[7] Plaintiff Stewart testified that she would have definitely approached the intersection with greater caution if she had seen a flashing light.

The trial court found that Metro's failure to provide any warning and/or traffic control at the intersection was a proximate cause of the collision and plaintiffs' resulting injuries. The evidence does not preponderate against this finding.

Appellant's last issue for review is "[w]hether the trial court committed reversible error by admitting and relying upon proof of subsequent remedial measures by the metropolitan government." Metro contends that the trial court committed reversible error by admitting testimony from Mr. Stair in which Mr. Stair stated that when he saw that the signal had not been

_____

[7]The record indicates that Mr. Grissim was at work repairing traffic signals on the afternoon of October 24th, and that he could have reached the intersection approximately thirty minutes after receiving notification of the inoperative signal.

repaired on October 25, 1988, he called an acquaintance in the Metro Mayor's Office to report the problem. After Mr. Stair made various phone calls to city officials, the signal was repaired the following day. Metro contends that the testimony was offered to show that Metro was negligent by not repairing the signal until two days after the accident in question. Metro argues that this testimony should have been excluded, because it constituted evidence of subsequent remedial measures under Tenn.R.Evid. 407.

It appears that this testimony was irrelevant and of no probative value with respect to any of the issues in this case. However, from our review of the record, we find that the admission of this evidence did not affect the judgment or result in prejudice to the judicial process. T.R.A.P. 36(b).

Metro also questions the trial court's allocation of fault. The trial court found Metro 50% at fault for the injuries and damages which the plaintiffs' sustained. The trier of fact has "considerable latitude in allocating percentages of fault to negligent parties." *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). An appellate court may modify those findings only if they are clearly erroneous. *Id*. Based upon the record before us, we cannot say that the trial court's allocation of fault to the respective defendants was clearly erroneous. The appellees' remaining issues are pretermitted.

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as are necessary. Costs of this appeal are assessed against the appellant.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**DAVID R. FARMER, JUDGE**

11