# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 11, 2010

## CHERYL BROWN GIGGERS, ET AL.
### v.
## MEMPHIS HOUSING AUTHORITY, ET AL.

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-000896-03     Kay S. Robilio, Judge**

---

**No. W2010-00806-COA-R9-CV - Filed December 14, 2010**

---

This is the second appeal of this wrongful death action, arising from a fatal shooting of a tenant at a Memphis public housing property. This Court granted Appellant, Memphis Housing Authority's, Tenn. R. App. P. 9 interlocutory appeal to address the trial court's denial of summary judgment in favor of the Appellant. Finding that Appellees' "failure to evict" claim is preempted by 47 U.S.C. §1437, and that Appellant retains its sovereign immunity under the discretionary function exception to the Tennessee Governmental Tort Liability Act, we reverse and remand for entry of summary judgment in favor of Appellant. Reversed and remanded.

### Tenn. R. App. P. 9. Interlocutory Appeal; Judgment of the Circuit Court Reversed and Remanded

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

C. Wesley Fowler, Memphis, Tennessee, for the appellant, Memphis Housing Authority.

Archie Sanders, III, Memphis, Tennessee, for the appellees, Cheryl Brown Giggers, Charles C. Brown, Jr., Angela Brown, and JoAnn Fisher.

Joe Lee Wyatt and William J. Wyatt, Memphis, Tennessee, for the appellee, Scruggs Security and Patrol, LLC.

### OPINION

The relevant facts are undisputed and are set out in this Courts' opinion, ***Giggers, et***

*al. v. Memphis Housing Authority*, No. W2006-00304-COA-R3-CV, 2007 WL 2216553 (Tenn. Ct. App. Aug. 3, 2007). On March 7, 2002, Charles Cornelius Brown, Sr. ("Decedent") was a resident of an apartment complex located at 741 Adams Avenue, in Memphis, which was owned and operated by the Memphis Housing Authority ("MHA" or "Appellant") when he was fatally shot. *Giggers*, 2007 WL 2216553, at *1. The shooter, L.C. Miller, who was approximately seventy years old at the time of the shooting, was also a tenant at the Adams Avenue property. On the day of the shooting, Mr. Miller had been asked to stop "using bad language and cursing" by a security guard for Scruggs Security & Patrol, LLC ("Scruggs"). *Id*. Scruggs and the MHA had a contract, under which Scruggs provided security for the Adams Avenue property. *Id*. When the security guard briefly left his station, Mr. Miller went back to his apartment, apparently for the purpose of obtaining a rifle. When the security guard returned, Mr. Miller began shooting at him. The Decedent, who was in the manager's office at the time, was struck and killed by one of the shots fired by Mr. Miller. *Id*.

On February 18, 2003, the Decedent's surviving children, Cheryl Brown Giggers, Charles C. Brown, Jr., and Angela G. Brown, and the Decedent's sister, Joann Fisher, (together with Ms. Giggers, Mr. Brown, Jr., and Ms. Brown ("Plaintiffs") filed a complaint against the City of Memphis (the "City") and the MHA, asserting claims for the wrongful death of the Decedent as a result of negligence, and for breach of contract pursuant to the Decedent's lease agreement with the MHA. *Giggers*, 2007 WL 2216553, at *1. Plaintiffs alleged negligence by the defendants in: (1) failing to properly screen Mr. Miller prior to leasing an apartment to him; (2) failing to enforce internal admissions and occupancy policies with regard to Mr. Miller; (3) allowing Mr. Miller to possess a rifle; and (4) failing to properly assess an allegedly known threat or risk to the other tenants of the public housing property. *Id*. Plaintiffs further asserted that the MHA had breached its lease agreement with Mr. Brown by failing to keep or maintain a "safe condition" at the premises. The City filed a motion to dismiss, or alternatively, for summary judgment, arguing that it was not a proper party to the litigation and that the MHA existed as a separate entity. *Id*. On September 12, 2003, the trial court entered an order, dismissing the City from the litigation and granting leave to Plaintiffs to amend their complaint. *Id.*

On September 16, 2003, Plaintiffs amended their complaint to name the MHA as the sole defendant. *Giggers*, 2007 WL 2216553, at *2. On April 28, 2004, the MHA filed its answer, in which it denied all liability and set forth several affirmative defenses. On May 27, 2004, Plaintiffs filed a second amended complaint, adding Scruggs (together with Plaintiffs, "Appellees") as a defendant and alleging that Scruggs had negligently failed to secure the property pursuant to its security contract with the MHA. *Id.* On August 20, 2004, Scruggs filed its answer, in which it denied liability and set forth various affirmative defenses. Scruggs also asserted a cross-claim against the MHA, alleging that the MHA was

negligent in screening Mr. Miller prior to his tenancy and in renting an apartment to him. *Id*. By its cross-claim, Scruggs sought indemnity in defending the litigation pursuant to the provisions of its contract with the MHA. *Id*. The MHA, in turn, filed its own cross-claim against Scruggs, alleging that Scruggs was vicariously liable for the negligent acts of its security guard, and that the MHA was entitled to indemnity from Scruggs pursuant to their security contract. *Id*.

On February 11, 2005, the MHA filed a motion to dismiss or for summary judgment as to all claims against it. *Giggers*, 2007 WL 2216553, at *2. On October 25, 2005, Plaintiffs opposed the MHA's motion for summary judgment, asserting, among other things, the following facts: (1) Mr. Miller was charged with aggravated assault in 1979; (2) in June 1977, Mr. Miller pled guilty to firing a weapon within the city limits of Memphis; (3) in May 1998, Mr. Miller, while a resident of the property at 741 Adams Avenue, hid behind some bushes in an attempt to stab another tenant with a knife and was, consequently, charged with aggravated assault. *Id.* at *3. Based upon the foregoing averments, Plaintiffs argued that the MHA had notice of Mr. Miller's propensity for violence, and specifically that it had actual notice of the 1998 incident, where Mr. Miller had attempted to stab another tenant. *Id*.

On October 28, 2005, the trial court held a hearing on the MHA's motion for summary judgment. *Giggers*, 2007 WL 2216553, at *3. In written correspondence to the parties, dated November 28, 2005, the trial court held that neither the internal policies of the MHA, nor the contents of Mr. Miller's criminal background check created any duty to the Plaintiffs under these circumstances. Moreover, after observing that a policy excluding those with prior records would result in a "massive underclass of ex-convicts homeless due to an inability to find housing," the trial court rejected Plaintiffs' argument that there was an affirmative duty on the part of the MHA to conduct a criminal background check on prospective residents. Finally, the trial court held that the Plaintiffs were not entitled to recover as third-party beneficiaries for breach of the terms of the lease agreement between the MHA and Mr. Miller. *Id*. at *4.

On direct appeal to this Court, Plaintiffs argued that, because the MHA had some awareness of Mr. Miller's propensity toward violence and, therefore, had a duty to take reasonable steps to maintain a safe premise, the trial court erred by dismissing the alternative theories of recovery in tort and contract. Based upon the MHA's prior knowledge of Mr. Miller's violent behavior, the Plaintiffs asserted that the MHA had a duty to monitor Mr. Miller's actions, or to evict him from the premises. *Giggers*, 2007 WL 2216553, at *6. On appeal, this Court affirmed the grant of summary judgment in favor of the MHA, holding that "an isolated violent outburst...by Miller was [in]sufficient to notify the MHA that criminal acts against its tenants were reasonably foreseeable." *Id.* at *11. Consequently, we held that the MHA owed no duty to Mr. Miller under the particular circumstances. *Id.* We further

held that a landlord has no affirmative duty to evict or closely monitor a tenant who is known to have a criminal history. *Id*. at \*12. Balancing the foreseeability and the gravity of the harm against the commensurate burden imposed on the landlord to provide protections against that harm, we opined that public policy considerations weighed against the imposition of any duty in this case. *Id*. We also considered the lease provisions requiring the MHA to "maintain the dwelling unit and development in a decent, safe and sanitary condition" as a separate basis for liability, and held that this language merely obligated the landlord to maintain the property so that the apartments and common areas were free from physical defects, and that the general rules of contract interpretation "did not contemplate protection of [tenants] from harm by third persons." *Id*. at 13 (quoting ***Archer v. Burton Plaza Assoc., Ltd.***, No. 03A01-9511-CV-00417, 1996 WL 93584, at \*2 (Tenn. Ct. App. Mar. 4, 1996)).

Our Supreme Court granted Plaintiffs' application for permission to appeal to consider the propriety of the negligence claim and, specifically, to determine whether the MHA's knowledge of Mr. Miller's prior act of violence at the apartments created a duty of care to Plaintiffs' Decedent. ***Giggers, et al. v. Memphis Housing Auth., et al.***, 277 S.W.3d 359, 363 (Tenn. 2009). The Supreme Court reversed this Court in part, finding that "a special relationship exists between a landlord and a tenant, placing an obligation on the landlord to take reasonable measures of protections...[b]ecause a reasonable person could foresee the probability of violence [at the Adams Avenue property,] and because the gravity of potential harm outweighs... the burden [on the MHA] of taking protective measures for the safety of the tenants." ***Giggers***, 277 S.W.3d at 371. Based upon this finding, our Supreme Court concluded that it was unable to determine, as a matter of law, that the Plaintiffs were not entitled to recover on a claim of negligence under any version of the facts, but cautioned that its ruling did not foreclose the possibility that the Plaintiffs would be unable to present sufficient evidence to support their claim. *Id*. at 372.[1]

Upon remand to the trial court, on July 31, 2009, the MHA filed a motion to dismiss for failure to state a cause of action pursuant to Tenn. R. Civ. P. 12.02(6), or, in the alternative, for a more definite statement. The MHA's motion was denied by order of September 14, 2009,[2] and Plaintiffs were allowed to file a third amended complaint on

---

[1] We note that the Supreme Court did not disturb the trial court's summary judgment, as affirmed by this Court, dismissing Plaintiffs claims based on the "safe environment" language in the lease, Plaintiffs' claims based on "allowing" Mr. Miller to possess a rifle, or Plaintiffs' claims based on the MHA's alleged failure to perform a background check when initially leasing an apartment to Mr. Miller. ***Giggers***, 277 S.W.3d at 362.

[2] The trial court's order dismisses the MHA's motion, and does not contain a more definite statement of the court's ruling. Consequently, we infer that both the motion to dismiss and the motion for more definite (continued...)

-4-

September 30, 2009, alleging a new claim for "failure to evict."  The "failure to evict" claim had previously been argued by Plaintiffs on appeal, but had not been pled until the third amended complaint.  On October 23, 2009, the MHA filed an answer to the third amended complaint, in which it denied liability and asserted the defenses of preemption and discretionary function immunity in response to the Plaintiffs' claims that the MHA had a common law duty to evict Mr. Miller.  On November 13, 2009, the MHA filed a motion to dismiss, or alternately, for summary judgment, on grounds that the Plaintiffs' only remaining claim against the MHA (i.e., failure to evict) is preempted by federal law, and is barred by the discretionary function exception to the waiver of immunity provided for by the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. §29-20-101, *et seq*.  The MHA's motion was heard on February 19, 2010.  On March 4, 2010, the trial court entered an order denying the MHA's motion for summary judgment as to the indemnity claim of Scruggs.  A second order was entered on March 4, 2010, which order provides, in relevant part, as follows:

> The two issues presented by MHA's Motion for Summary Judgment are:
>
> 1.  Whether the Plaintiffs' new state law claims alleging a duty to evict Mr. L.C. Miller based on a prior altercation between Mr. Miller and another tenant are preempted by federal law requiring the MHA to use discretion in making eviction and occupancy decisions.
>
> 2.  Whether Plaintiffs' new claims alleging a duty to evict Mr. L.C. Miller are barred by the Discretionary Function Exception to the waiver of sovereign immunity under  the Tennessee Governmental Tort Liability Act.
>
> Although the Court finds merit to these arguments, given the prior appeal in this case the Court finds that the MHA's Motion for Summary Judgment should be denied.

In response to the trial court's denial of its motion for summary judgment, the MHA moved the lower court for permission to file an interlocutory appeal under Tenn. R. App. P. 9, which motion was granted by the trial court's order of April 6, 2010.  By order of June 24, 2010, this Court granted the interlocutory appeal to address two issues, as stated by the MHA

---

[2](...continued)
statement were denied.

in its brief (and adopted by Scruggs in its brief), to-wit:

> 1. Whether Plaintiffs' state law claim, alleging a duty on the part of the MHA to evict Mr. Miller is preempted by 42 U.S.C.S. §1437(d)(1)(6) and 24 C.F.R. §966.4?

> 2. Whether Plaintiffs' state law claim, alleging a duty on the part of the MHA to evict Mr. Miller is barred by the discretionary function exception to the waiver of sovereign immunity under Tenn. Code Ann. §29-20-101, *et seq.*, the Tennessee Governmental Tort Liability Act?

Before reaching these issues, we pause to discuss a deficiency in the trial court's order denying the MHA's motion for summary judgment. Prior to July 1, 2007, the trial court was not required to state the legal grounds for granting or denying summary judgment in its order; inclusion of the legal grounds were only necessary "upon request" of either party. However, Tenn. R. Civ. P. 56.04 was amended, effective July 1, 2007, to state: "[t]he trial court **shall** state the legal grounds upon which the court denies or grants the motion, which shall be included in the order reflecting the court's ruling" (emphasis added). As set out above, the order appealed in this case does not comply with Tenn. R. Civ. P. 56.04. When the legal grounds for the trial court's decision are omitted, a reviewing court cannot analyze the decision's validity, and appellate review becomes unnecessarily speculative. The 2007 amendment to Tenn. R. Civ. P. 56.04 was intended to cure this problem. The Rule's requirements are specific and without exception. ***Winn v. Welch Farms***, No. M2009-01595-COA-R3-CV, 2010 WL 2265451 (Tenn. Ct. App., June 4, 2010) (citing ***Eluhu v. HCA Health Servs. of Tenn. Inc.***, No. M2008-01152-COA-R3-CV, 2009 WL 3460370, at *21 (Tenn. Ct. App. Oct. 27, 2009)). Here, the trial court states only that, "[a]lthough the Court finds merit to [the MHA's] arguments, given the prior appeal in this case the Court finds that the MHA's Motion for Summary Judgment should be denied." This is not a legal basis for the decision to deny the MHA's motion; consequently, we find that the trial court erred in failing to include the legal basis for its denial of summary judgment in the order.

However, the case before us presents the rare instance when such an error will not compel a remand to the trial court. *See **White v. Pulaski Elec. Sys.***, No. M2007-01835-COA-R3-CV, 2008 WL 3850525, at *3 (Tenn. Ct. App. Aug. 18, 2008); ***Burgess v. Kone, Inc.***, No. M2007-02529-COA-RC-CV, 2008 WL 2796409, at *2 (Tenn. Ct. App. July 18, 2008). Here, the record presents clear legal issues (i.e., whether Plaintiffs' case is preempted by federal law and/or whether it is barred by the discretionary function exception to the waiver of sovereign immunity under the TGTLA), which issues were almost

certainly the basis for the trial court's decision to deny summary judgment in favor of the MHA. Therefore, for the sake of judicial economy, we will "soldier on without guidance from the trial court." *Church v. Perales*, 39 S.W.3d 149, 158 (Tenn. Ct. App. 2000). However, in so doing, we do not recognize any general exception to the clear requirements of Tenn. R. Civ. P. 56.04.

Turning to the issues, we first note that it is well settled that a motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery material, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial.

*Id*. at 211 (citations omitted).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). In the instant case, the material facts are not disputed. Because only questions of law are involved, there is no presumption of correctness regarding a trial court's denial of summary judgment. *See Bain*, 926 S.W.2d at 622. Therefore, our review of the trial court's denial of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

### Whether a State Law Tort Claim Against a Public Housing Authority for "Failure to Evict" a Tenant is Barred by the Doctrine of Preemption.

In raising their "failure to evict" claim against the MHA, Plaintiffs allege that the MHA had a common law duty to evict Mr. Miller after he attempted to stab another tenant in 1998. The MHA argues that, if this Court were to hold that Plaintiffs' claim for "failure

-7-

to evict" is not preempted, this decision would "create a common law duty to evict a tenant, which is inconsistent with, or stands as an obstacle to, the accomplishment of the full purposes and objectives of federal law controlling public housing authorities eviction and occupancy decisions." Plaintiffs argue that MHA's position misapprehends the congressional purpose underlying 42 U.S.C. § 1437d and 24 C.F.R. § 966.4, and also misconstrues the nature of the Plaintiffs' claim.

As part of the Anti-Drug Abuse Act of 1988, Congress enacted legislation giving local public housing authorities ("PHAs") the authority to evict tenants. Because Plaintiffs argue that the MHA should have evicted Mr. Miller following the 1998 stabbing incident, MHA's authority to do so was governed by statutes and regulations in effect at that time. Here, that statute is the 1997 version of 42 U.S.C. § 1437d, which provides, in relevant part, as follows:

> (l) Leases; terms and conditions; maintenance; termination
>
> Each public housing agency shall utilize leases which–
>
> *                                *                                *
>
> (5) provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy;

Concerning the reason for the enactment of this statute, 56 Fed. Reg. 51,560 (Oct. 11, 1991) provides, in relevant part, as follows:

> The Congress has determined that drug crime and criminal threats by public housing household members are a special danger to the security and general benefit of public housing residents, warranting special mention in the law. (U.S.H. Act, section 6(l)(5), 42 U.S.C. § 1437d(l)(5).) For this reason, the Congress specified that these types of criminal activity by household members are grounds for termination of tenancy (without the need for a separate inquiry as to whether such criminal activity constitutes serious or repeated lease violation or other good cause for eviction). The legislative determination by the Congress rests on a reasonable judgment that the potential for a PHA to exercise eviction as a contractual sanction against

criminal behavior by unit occupants will promote the welfare of public housing residents in general, and will support the effective management of the housing. Since this judgment is reasonable, and promotes a legitimate public purpose, the legislation is Constitutional under the normal equal protection standard.

*See* 56 Fed. Reg at 51,560-67 for full context.

In accordance with the intent of the Anti-Drug Abuse Act, HUD regulations mandate that PHAs have authority to determine whether to evict tenants. As is applicable to this case, 24 C.F.R. § 966.4 (1997) provides:

> (l) Termination of tenancy and eviction.–
>
> *                 *                 *
>
> (5) Eviction for criminal activity–
>
> (i) PHA discretion to consider circumstances. In deciding to evict for criminal activity, the PHA shall have discretion to consider all of the circumstances of the case, including the seriousness of the offense, the extent of participation by family members, the effects that the eviction would have on family members not involved in the proscribed activity. In appropriate cases, the PHA may permit continued occupancy by remaining family members and may impose a condition that the family members who engaged in the proscribed activity will not reside in the unit....[3]

---

[3] The current version of 24 C.F.R. § 966.4 is more expansive than the 1997 version, and provides further guidance in determining the Legislative intent underlying the Anti-Drug Abuse Act. The current regulation provides, in relevant part, as follows:

> (l) Termination of tenancy and eviction.–
>
> *                 *                 *
> (5) PHA termination of tenancy for criminal activity or alcohol abuse.
> (i) Evicting drug criminals.
> (A) Methamphetamine conviction. The PHA must immediately terminate

(continued...)

In ***Dep't of Housing and Urban Dev. v. Rucker***, 535 U.S. 125 (2002), the Supreme Court discussed the Congressional intent underlying the mandatory lease provisions that afford PHAs the right to evict a tenant for drug-related crimes committed on or off premises by members of the tenant's household, a guest, or someone under the tenant's control. ***Id***. at 127-28. While the ***Rucker*** Court recognized that the strict liability inherent in a "no-fault" eviction "maximizes deterrence and eases enforcement difficulties," ***Rucker***, 535 U.S. at 134, the Court nonetheless recognized the legislative intent to place discretion with the PHAs to make those eviction decisions:

> The statute [i.e., 42 U.S.C. § 1437d(l)(6)] does not require the eviction of any tenant who violated the lease provision. Instead,

---

[3](...continued)

> the tenancy if the PHA determines that any member of the household has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.
>
> \*   \*   \*
>
> (ii) Evicting other criminals.
> (A) Threat to other residents. The lease must provide that any criminal activity by a covered person that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including PHA management staff residing on the premises) or threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises is grounds for termination of tenancy.
>
> \*   \*   \*
>
> (iii) Eviction for criminal activity.
> (A) Evidence. The PHA may evict the tenant by judicial action for criminal activity in accordance with this section if the PHA determines that the covered person has engaged in the criminal activity, regardless of whether the covered person has been arrested or convicted for such activity and without satisfying the standard of proof used for a criminal conviction.
>
> \*   \*   \*
>
> (vii) PHA action, generally.
>
> \*   \*   \*
>
> (B) Consideration of circumstances. In a manner consistent with such policies, procedures and practices, the PHA may consider all circumstances relevant to a particular case such as the seriousness of the offending action, the extent of participation by the leaseholder in the offending action, the effects that the eviction would have on family members not involved in the offending activity and the extent to which the leaseholder has shown personal responsibility and has taken all reasonable steps to prevent or mitigate the offending action.

it entrusts that decision to the local public housing authorities, who are in the best position to take account of, among other things, the degree to which the housing project suffers from "rampant drug-related or violent crime," 42 U.S.C. § 11901(2) (1994 ed. and Supp. V), "the seriousness of the offending action," 66 Fed. Reg., at 28803, and "the extent to which the leaseholder has ... taken all reasonable steps to prevent or mitigate the offending action," *ibid*.

***Rucker***, 535 U.S. 125 at 133-34.

According to a letter provided by Appellant, after the Supreme Court's opinion in ***Rucker***, the Secretary of HUD reiterated to directors of local PHAs that they were to use their federally granted discretion, and were to balance important policies when making decisions based on criminal activities:

June 6, 2002

Dear Public Housing Directors:

In light of several inquiries that HUD has received recently, the Secretary has asked me to share with you our views regarding the March 26, 2002 decision of the Supreme Court in HUD v. Rucker. In Rucker, the Court unanimously affirmed the right of the public housing authorities, under a statutorily-required lease clause, to evict entire public housing households whenever any member of the household, or any household guest, engages in drug-related or certain other criminal activity. The Rucker decision upholds HUD regulations that, since 1991, have made it clear both that the lease provision gives PHAs such authority and that PHAs are not required to evict an entire household–or, for that matter, anyone–every time a violation of the lease clause occurs.

Therefore, after Rucker, PHAs remain free, as they deem appropriate, to consider a wide range of factors in deciding whether, and whom, to evict as a consequence of such a lease violation. Those factors include, among many other things, the seriousness of the violation, the effect that eviction of the entire household would have on household members not involved in

the criminal activity, and the willingness of the head of household to remove the wrongdoing household member from the lease as a condition for continued occupancy. The Secretary and I encourage you to consider such factors and to balance them against the competing policy interests that support the eviction of the entire household.

Like Congress and the Supreme Court, HUD recognizes that PHAs are in the best position to determine what lease enforcement policy will most appropriately serve the statutory interest of protecting the welfare of the entire tenant population. I know that you will continue to act in a manner that protects that general welfare, while giving consideration–when you deem it appropriate–to the interest of individuals who share a household with the wrongdoer, but were otherwise unconnected with the wrongdoing.

In addition to the foregoing letter, on October 29, 2002, HUD issued NOTICE H2002-22 to all Directors of PHAs in the United States, which Notice provides, in relevant part, as follows:

> TERMINATING TENANCY–LEASE PROVISIONS
> In accordance with the regulation at 24 C.F.R. 5.861, the Landlord may terminate tenancy and evict the tenant through judicial action for criminal activity by a covered person if the Landlord determines that the covered person has engaged in the criminal activity, regardless of whether the covered person has been arrested, or convicted for such activity and without satisfying a criminal standard of proof of the activity. HUD encourages, but does not require, Landlords to take into account individual circumstances when making a determination to terminate tenancy; such circumstances might include, among other things, the seriousness of the offending action, the extent of participation by the leaseholder in the offending action, and whether the leaseholder, if not the wrongdoer, took all feasible steps to prevent the offending action from occurring and has removed the offending person from the lease or otherwise banned the offending person from the premises in the future.

HUD NOTICE H 2002-22, *Screening and Eviction for Drug Abuse and Other Criminal*

-12-

*Activity–Final Rule* (Oct. 29, 2002). Available at http:// www.hud.gov/offices/adm/hudclips/notices/hsg/02hsgnotices.cfm.

The above directives and instructions to PHAs appear to be consistent with the federally established role of the PHAs when faced with potential eviction decisions. In essence, PHAs are to exercise discretion by balancing the various competing policy considerations in light of all relevant circumstances. The question, then, is whether a state law claim against a PHA for failure to evict a tenant stands as an obstacle to the accomplishment of the full purpose and objective of 42 U.S.C. § 1437d and 24 C.F.R. § 966.4.

Federal preemption of state law is derived from the Supremacy Clause, which provides that state legislation shall be subordinate to federal law:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.

U.S. Const. art. VI, § 1, cl. 2. Addressing the meaning of the Supremacy Clause in *Perez v. Campbell*, 402 U.S. 637 (1971), the United States Supreme Court explained:

> As early as *Gibbons v. Ogden*, 9 Wheat. 1, 6 L.Ed. 23 (1824), Chief Justice Marshall stated the governing principle-that "acts of the State Legislatures * * * (which) interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause. *Id.*, at 211.... Three decades ago Mr. Justice Black, after reviewing the precedents, wrote in a similar vein that, while "(t)his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, ha(d) made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference (,) * * * (i)n the final analysis, our function is to determine whether a challenged state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85

L.Ed. 581 (1941).

*Id.* at 649.

Moreover, in ***Barnett Bank of Marion Co., N.A. v. Nelson***, 517 U.S. 25 (1996), the United States Supreme Court noted appropriate considerations with respect to determining the preemption question in those cases where the federal statute does not contain language showing that Congress explicitly intended to preempt state law:

> Sometimes courts, when facing the pre-emption question, find language in the federal statute that reveals an explicit congressional intent to pre-empt state law. More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the federal statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. A federal statute, for example, may create a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Alternatively, federal law may be in "irreconcilable conflict" with state law. Compliance with both statutes, for example, may be a physical impossibility.

*Id*. at 31 (citations omitted).

Under so-called "conflict preemption," "[a] state cannot impose common law damages on individuals for doing what a federal act or regulation authorized them to do." *See, e.g.,* ***Irving v. Mazda Motor Corp***., 136 F.3d 764, 769 (11ᵗʰ Cir. 1998).  In this case, the MHA, a federally funded PHA, asserts that Plaintiffs' claim for "failure to evict" falls within the doctrine of conflict preemption because such a claim would "at the very least, interfere with the federally vested discretion granted to PHAs in making eviction decisions by subjecting PHAs to potential civil money damages if [the discretion granted to PHAs under the foregoing statutory scheme] were to be used" in any way other than eviction.

The question of  implicit conflict preemption was discussed by the United States Supreme Court in ***Fidelity Federal Savings & Loan Association v. de la Cuesta***, 458 U.S. 141 (1982).  In that case, a federal regulation permitted federal savings and loan associations to include a due-on-sale clause in loan instruments at their option.  The defendant federal savings and loan association exercised its option to include the clause. Plaintiff borrowers sued the association for damages, and claimed the due-on-sale clause in their loan instrument was unenforceable under a rule of California common law. The Supreme Court held that the

federal regulation preempted the California common law because the common law rule prohibited the exercise of the federally authorized option. *Id.* at 155. In reaching its decision, the Supreme Court held that a state common law rule cannot take away the flexibility provided by a federal regulation, and cannot prohibit the exercise of a federally granted option. *Id.*

As discussed above, pursuant to 47 U.S.C. § 1437 and the federal regulations promulgated thereunder, there is no indication that the federal statute mandates PHAs to evict tenants for criminal activities. Rather, from the legislative history, the federal regulations, and the HUD analysis of the statutory scheme, we conclude that it was the legislative intent of 47 U.S.C. § 1437 to allow PHAs to use their discretion to determine whether eviction is necessary under the particular facts presented. If we were to hold, as Plaintiffs suggest, that the MHA was required to evict Mr. Miller for conduct constituting criminal activity, we would negate the discretion granted by the statute. Here, the record indicates that the MHA exercised its discretion after the 1998 stabbing incident between Mr. Miller and Mr. Triplett. Although the record does not elaborate on the exact steps that the MHA took in response to the 1998 stabbing incident, the parties agreed that the MHA did conduct an investigation, and that the MHA placed Mr. Miller on probation for one year as a result of that investigation. If we were to allow Plaintiffs' claim for "failure to evict," such a holding could result in the MHA being liable for money damages solely because the MHA exercised its discretion and chose to allow Mr. Miller a second opportunity to conduct himself in accordance with the rules and regulations of the property. While we concede that the MHA's decision ultimately proved unwise, we nonetheless conclude that 47 U.S.C. § 1437 gave it the discretion to make that choice. In accordance with the Supreme Court's holding in *de la Cuesta*, we conclude that allowing Plaintiffs' "failure to evict" claim would, in effect, remove the element of choice authorized under 47 U.S.C. § 1437, and would frustrate the federal regulatory scheme. Therefore, we hold that Plaintiffs' theory of recovery is implicitly preempted by 47 U.S.C. § 1437 and the federal regulations pertaining thereto.

### Discretionary Function Exception to Sovereign Immunity

Even if we assume that Plaintiffs' "failure to evict" claim is not preempted by 47 U.S.C. § 1437, Plaintiffs' claim is, nonetheless, barred by the discretionary function exception to sovereign immunity.

It is well settled that local governmental entities are immune from suit except when a statute explicitly allows them to be sued. *See, e.g., Jane Doe v. Coffee Co. Bd. of Educ.*, 852 S.W.2d 899, 906 (Tenn. Ct. App. 1992). The TGTLA removes this immunity only in certain enumerated situations. Tenn. Code Ann. § 29-20-205 (Supp. 2010) removes the sovereign immunity of governmental entities for injuries proximately caused by the

negligence of an employee acting within the scope of his or her employment; however, there are several exceptions to this removal of sovereign immunity. The exception that is applicable to the instant case provides that immunity is not removed if the injury arises out of "the exercise of performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." Tenn. Code Ann. § 29-20-205. In *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73 (Tenn. 2001), our Supreme Court discussed the discretionary function exception to the TGTLA as follows:

> This exception immunizes local governmental entities from liability for an employee's negligence if the injury arises out of "the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." Essentially, *the discretionary function exception prevents the use of tort actions to second-guess what are essentially legislative or administrative decisions involving social, political, economic, scientific, or professional policies or some mixture of these policies. Doe v. Coffee County Bd. of Educ.*, 852 S.W.2d 899, 907 (Tenn. Ct. App. 1992) (citing *United States v. Gaubert*, 499 U.S. 315, 323, 111 S. Ct. 1267, 113 L. Ed.2d 335 (1991)). The rationale for preserving immunity for certain acts performed by governmental entities is that the government should be permitted to operate without undue interference by the courts, as courts are often "ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision." *Bowers v. City of Chattanooga*, 826 S.W.2d 427, 431 (Tenn. 1992) (quoting *Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982)); *see also Carlson v. State*, 598 P.2d 969, 972 (Alaska 1979).

*Limbaugh*, 59 S.W.3d at 84-85 (emphasis added).

In *Bowers v. City of Chattanooga*, 826 S.W.2d 427 (Tenn. 1992), our Supreme Court explained that "discretionary function immunity attaches to *all conduct properly involving the balancing of policy considerations. Therefore, there may be occasions where an 'operational act' is entitled to immunity, where, for instance, the operational actor is properly charged with balancing policy considerations.*" *Id*. at 431 (emphasis added). In *Doe v. Coffee Co. Bd. of Educ.*, 852 S.W.2d 899, 907 (Tenn. Ct. App. 1992), this Court construed Tenn. Code Ann. § 29-20-205(1) to prevent the use of tort actions to challenge policy. The question, then, is whether eviction decisions by PHAs constitute discretionary functions.

-16-

As discussed above, the legislative intent of 47 U.S.C. § 1437 vests PHAs with discretion in deciding whether to evict its tenants. Other statutes also indicate that eviction decisions made by PHAs constitute discretionary functions. Tenn. Code Ann. § 13-20-104(a)(9) provides that a housing authority has the power to "[a]ct as agent for the federal government in connection with the acquisition, construction, operation and/or management of a housing project or any part thereof." Likewise, 24 C.F.R. §966.4(l)(5)(vii)(B) clearly vests PHAs with discretion to determine whether to evict a tenant based on the type of criminal activity, and considering "all circumstances." *See supra* note 3. Consequently, when determining whether to evict a tenant, a PHA is performing a function delegated to the PHA by the federal government. In delegating this discretionary function to local PHAs, the federal government recognizes that a local PHA is better able to consider the individual facts and circumstances and to make a determination regarding occupancy and evictions. As stated by the Supreme Court in **Rucker**, "[t]he statute does not require the eviction of any tenant who violated the lease provision. Instead, it entrusts that decision to the local public housing authorities, who are in the best position to take account of [all relevant circumstances]." **Rucker**, 533 U.S. at 133-34.

This Court has also recognized that eviction decisions by PHAs involve federally granted discretionary decision making, to-wit:

> Among the powers granted a Housing Authority under this Act [Tenn. Code Ann. §§13-801 *et seq.*, 13-804(8)] is the power to act as agent for the Federal Government in connection with the acquisition, construction, operation and/or management of a housing project or any part thereof (13-804 (8)). *Under said statute (13-812) the powers and duties of the Housing Authority with respect to rentals and tenant selection are regulated and restricted.* Thus, it is seen that the operation of a housing project by the plaintiff is the exercising of a governmental function and it follows that, in the exercise of this function, the agents of said authority cannot act arbitrarily or capriciously in the renting of space to tenants or in the eviction of tenants from the project.

*Nashville Hous. Auth. v. Taylor*, 442 S.W.2d 668, 672 (Tenn. Ct. App. 1968) (emphasis added).

In **Bowers**, our Supreme Court adopted a planning-operational test, under which it is the "nature of the conduct" (i.e., the decision-making process), as opposed to the "status of the actor," that governs the question of whether the exception applies. **Bowers**, 826 S.W.2d

-17-

at 430-31. Under this test, decisions that rise to the level of planning or policy-making are considered discretionary acts that do not give rise to tort liability. On the other hand, decisions that are merely operational are generally not considered discretionary acts and, therefore, do not trigger immunity. *Id.* However, the *Bowers* Court went on to explain that, "there may be occasions where an 'operational act' is entitled to immunity, *where, for instance, the operational actor is properly charged with balancing policy considerations.*" *Id*. (emphasis added); *see also **United States v. Gaubert***, 499 U.S. 315, 326 (Tenn. 1991). As discussed above, a PHA's decision concerning whether to evict a tenant after allegations of criminal activity clearly involves fact-specific considerations of "all circumstances," and requires a "balancing of policy considerations." *Bowers*, 826 S.W.2d at 430-31; 24 C.F.R. § 966.4(l)(5)(vii)(B).

Although the distinction between decisions by governmental actors that involve "balancing policy considerations," and those that are truly operational in nature is admittedly murky, in *Bowers*, the Court considered the distinction under the facts of that case and held that, "[t]here being a clear plan and policy of the State of Tennessee and City of Chattanooga to provide safe passage across an immediate street toward a child's destination, we find that a decision left to a school bus driver on where to stop at a particular intersection is an operational act not within the discretionary function exception." *Bowers*, 826 S.W.2d at 432. In its brief, the MHA, relying upon the *Bowers* holding, asserts that a bus driver's decision to stop or not stop at an intersection is clearly operational, whereas decisions by PHAs as to whether to evict a tenant involve fact-specific investigations and discretionary balancing of federal policies, thus rendering such activities "planning" in nature. We agree.

If PHA eviction decisions involving all criminal activity merely followed a pre-determined, mandated policy (i.e., such as the mandatory eviction for manufacturing methamphetamine, *see* 24 C.F.R. § 966.4(1)), then these decisions would be truly operational in nature. However, in determining whether to evict tenants after allegations of criminal activity, PHAs must balance the effect of that decision on the tenant with the potential effect on other tenants of declining eviction of the offending tenant. This decision requires investigations into the allegations, and consideration of the mission of HUD. Consequently, the decision to evict (for other criminal activity) involves "balancing policy considerations" because the decision must be made in light of the individual circumstances of each case (except for the narrow exception of methamphetamine manufacturing, which requires mandatory eviction). Therefore, we hold that the MHA's decision whether to evict Mr. Miller was a "planning" level decision to which the discretionary function exception to sovereign immunity applies.

Even were we to assume that the MHA's decision whether to evict was operational in nature, the discretionary function exception would still apply to the specific facts of this

case. Where an operational decision-maker acts reasonably in implementing an established policy and such actions further the underlying policy, then the entity's immunity is not abrogated. *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 85 (Tenn. 2001). It is when such an operational decision-maker does not "act reasonably but pursues a course of conduct that violates mandatory regulation [that] the discretionary function exception will not apply because the action would be contrary to the entity's established policy." *Id.* In *Limbaugh*, a nursing home resident's conservator filed suit against the Coffee Medical Center, a governmental entity, seeking damages for injuries resulting from a nursing home employee's alleged assault on the resident. *Limbaugh*, 59 S.W.3d at 76. The Court determined that the nursing home had implemented a specific policy regarding discipline of employees, but had failed to follow its own policy. *Id*. at 85. The Court held that "the nursing home's broad discretion to implement a policy governing the questions of whether and how to discipline combative employees is indeed a policy determination that cannot give rise to tort liability." *Id*. at 86. However, because the nursing home had negligently failed to follow its prescribed guidelines, the discretionary function exception did not apply and governmental immunity was waived. *Id.* at 85-86.

*Limbaugh* is distinguishable from the case at bar. Here, the undisputed facts establish that the MHA acted consistently with its federal mandate, by exercising its discretion in evaluating the circumstances involved in the 1998 stabbing incident. Although, as noted above, the record does not fully outline the extent or nature of the MHA's inquiry into the 1998 incident, the parties do not dispute the fact that the inquiry occurred. Moreover, following its inquiry, the MHA further exercised its discretion in placing Mr. Miller on probation. Because the MHA reasonably implemented its federally mandated discretion, *Limbaugh* would not abrogate governmental immunity even if the eviction determination was an operational level decision.

For the foregoing reasons, we reverse the trial court's order, denying summary judgment in favor of the MHA. Because Appellees' cause of action for "failure to evict" is preempted under 42 U.S.C. § 1437, and because the Appellant retains sovereign immunity under the discretionary function exception to the TGTLA, we remand the case for entry of summary judgment in favor of the MHA, and for such further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are assessed against the Appellees, Cheryl Brown Giggers, Charles C. Brown, Jr., Angela Brown, Joann Fisher, and Scruggs Security and Patrol, for which execution may issue if necessary.

_____

J. STEVEN STAFFORD, JUDGE
