IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 12, 2018 Session

## RIVERLAND, LLC v. CITY OF JACKSON TENNESSEE

Appeal from the Circuit Court for Madison County
No. C-15-165     Kyle Atkins, Judge

_____

No. W2017-01464-COA-R3-CV

_____

Appellant sued the City of Jackson, Tennessee, after Appellant's commercial building was damaged by flooding. Appellant stated claims, under the Governmental Tort Liability Act, for temporary and permanent nuisance, trespass, negligence, and gross negligence. Appellant also sought relief for inverse condemnation and equitable relief under a theory of nuisance. On a grant of summary judgment, the trial court dismissed the GTLA claims, finding that the City's immunity to suit was not removed. The trial court also granted summary judgment to the City on the inverse condemnation and nuisance claims. Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Todd D. Siroky, Jackson, Tennessee, for the appellant, Riverland, LLC.

John D. Burleson and Matthew R. Courtner, Jackson, Tennessee, for the appellee, City of Jackson, Tennessee.

## OPINION

### I. Background

On March 15, 2013, Agape Child & Family Services, Inc. ("Agape") sold real property located at 77 Executive Drive, Jackson, Tennessee 38305 ("the Property") to Appellant Riverland, LLC ("Riverland"). Brad Hayes is the sole owner of Riverland. The Property is located within the Madison Square Business Park ("MSBP"). A private developer began building the MSBP in the 1970s. Appellee City of Jackson, Tennessee

("the City") did not design or construct the MSBP, nor did it design or construct the drainage structures on the Property. The City's involvement in the MSBP was limited to confirming that the construction plans and final plat satisfied the City's minimum standards in place at the time. The City may have also issued building permits and certificates of occupancy and compliance.

There is a commercial office building on the Property that Riverland owns and leases to a third party. A drainage ditch runs along the northern boundary of the Property, and a metal drainage pipe runs along the western boundary of the Property. The drainage ditch and the metal drainage pipe intersect at the northwest corner of the Property. The metal drainage pipe carries storm water from the northwest corner of the Property to the southwest corner of the Property. Riverland alleges that the City has a right-of-way and an easement for utilities and drainage along both the northern and western boundaries of the Property; the City disputes this.

On August 8, 2014, after heavy rainfall, the Property flooded, and storm water entered the commercial building. On August 18, 2014, the Property again flooded after heavy rainfall. Both parties agree that the metal drainage pipe is deteriorating. Riverland argues that the City owns the drainage infrastructure that caused the flooding because the City allegedly holds an easement and right-of-way on the Property. Riverland further argues that the City has a responsibility to maintain and repair the drainage infrastructure but has failed to do so. The City denies that it has an easement or right-of-way on the Property. The City also denies that it owns or is in any way responsible for the drainage infrastructure on Riverland's Property. The City acknowledges that it accepted maintenance of both the streets in the MSBP and the drainage improvements within the roads' right-of-way after the developer completed building the MSBP. However, the City argues that it never accepted maintenance of the drainage structures beyond the roads' right-of-way. Further, the City argues that it never performed any maintenance on the Property's drainage structures after they were built by the private developer.[1]

On May 18, 2015, Riverland filed its Complaint in the Madison County Circuit Court ("trial court"), seeking injunctive relief and money damages from the City. Riverland alleged that the City was responsible for damages to the Property because it owned the drainage structures on the Property and failed to maintain and repair them. Riverland asserted claims against the City under the Governmental Tort Liability Act ("GTLA") for temporary and permanent nuisance, trespass, negligence, and gross negligence. Riverland also asserted a claim of inverse condemnation and an equitable claim to abate the nuisance. The City filed its answer on June 29, 2015.

---

[1] In 2011, when Agape still owned the Property, it reported to the City that the Property had a history of flooding. The City examined the issue, discovered that the metal drainage pipe was deteriorating, and advised Agape that it would not repair the metal drainage pipe because it was located on private property.

On December 28, 2016, the City filed a Motion for Summary Judgment as to all claims. By order of June 21, 2017, the trial court granted the City's motion and found that Riverland failed to establish an essential element of its claim. Specifically, the trial court found that immunity had not been removed under sections 29-20-204(a), 29-20-205(1), and 29-20-205(3) of the GTLA. Riverland appealed. In February 2018, this Court dismissed the appeal for lack of a final judgment because the trial court did not adjudicate Riverland's claims for equitable relief on the grounds of nuisance, inverse condemnation or trespass. Based on the dismissal, the City filed its Motion for Supplemental Ruling on Defendant's Motion for Summary Judgment. By order of April 9, 2018, the trial court entered an amended order granting the City's motion for summary judgment as to the remaining claims.[2] The order is now final and appealable under Tennessee Rule of Appellate Procedure 3.

## II. Issue

Riverland raises six issues for review, which we restate as follows:

1. Whether the trial court erred when it determined that the City's immunity under the GTLA had not been removed.

2. Whether the trial court erred when it granted the City's motion for summary judgment as to Riverland's inverse condemnation claim.

3. Whether the trial court erred when it granted the City's motion for summary judgment as to Riverland's claim for equitable relief.

## III. Standard of Review

Riverland appeals the grant of summary judgment on all of its claims. A trial court's decision to grant a motion for summary judgment presents a question of law. Therefore, our review is *de novo* with no presumption of correctness afforded to the trial court's determination. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). This Court must make a fresh determination that all requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. *Abshure v. Methodist Healthcare-Memphis Hosps*., 325 S.W.3d 98, 103 (Tenn. 2010). When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The Tennessee Supreme Court has explained that when the party moving for summary judgment does not bear the burden of proof at trial, "the moving party may satisfy its

---

[2] This order was based on the trial court's oral ruling, which was incorporated into its amended order.

burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." ***Rye v. Women's Care Center of Memphis, MPLLC***, 477 S.W.3d 235, 264 (Tenn. 2015) (italics omitted). Furthermore,

> "When a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." ***Matsushita Elec. Indus. Co.,*** [***Ltd. v. Zenith Radio Corp***.], 475 U.S. [574,] 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

***Rye***, 477 S.W.3d at 265

## IV. Analysis

## A. Governmental Tort Liability Act

Riverland appeals the trial court's grant of summary judgment as to the following tort claims: (1) negligence (including gross negligence); (2) nuisance (temporary and permanent); and (3) trespass. The GTLA provides general immunity from tort liability for all governmental entities. Immunity is removed, and a governmental entity may be sued in tort, only in specific and limited circumstances. As the Tennessee Supreme Court explained in ***Lucius v. City of Memphis***, 925 S.W.2d 522 (Tenn. 1996):

> The doctrine of sovereign immunity, which has been a part of Tennessee law for more than a century, provides that suit may not be brought against a governmental entity except to the extent that the governmental entity has consented to be sued. ***Cruse v. City of Columbia***, 922 S.W.2d 492 (Tenn. 1996). The doctrine was codified in 1973 when the legislature enacted the GTLA. The GTLA governs claims against counties, municipalities, and other local governmental agencies, but does not apply to state government, its agencies, and departments. *See **Tenn. Dept. of Mental Health & Mental Retardation v. Hughes***, 531 S.W.2d 299, 300 (Tenn. 1975). Specifically, the Act provides that "[e]xcept as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from the activities of

- 4 -

such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions . . . ." Tenn. Code Ann. § 29-20-201(a). The Act then removes immunity under certain circumstances.

*Lucius*, 925 S.W.2d at 525. Therefore, in order for the City to be liable under the GTLA, it must first have waived immunity to suit. We now turn to that question. In finding that the City's immunity was not waived, the trial court relied on and discussed three sections of the GTLA, § 29-20-204(a), § 29-20-205(1), and § 29-20-205(3), and we will address all three GTLA provisions on which the trial court relied.[3]

## 1. T.C.A. § 29-20-204:  Dangerous Structures

Under Tennessee Code Annotated section 29-20-204(a),

[i]mmunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition **of any public building, structure, dam, reservoir or other public improvement owned and controlled** by such governmental entity.

Tenn. Code Ann. § 29-20-204(a) (emphasis added).

While Riverland concedes that the City never owned the Property, Riverland argues that the City's alleged easement and/or right-of-way "established the City's ownership of and responsibilities for the utilities and structures that were placed in the easement and right-of-way."[4] The trial court disagreed concluding that

[p]ursuant to Tennessee case law, "[f]or immunity to be removed pursuant to the GTLA, the location that allegedly caused the accident must be owned and controlled by the government entity being sued." *Watts v. Morris*, No. W2008-00896-COA-R3-CV, 2009 WL 1228273, at *5 (Tenn. Ct. App. May 6, 2009). Although it is disputed whether [the City] has an easement on the property, an easement does not constitute ownership for purposes of Tennessee law. *See Cumulus Broad, Inc. v. Shim*, 226 S.W.3d 366, 379 (Tenn. 2007) (stating "[a] prescriptive easement does not constitute ownership and the right acquired is limited to the specific use."); *Vanderbilt Univ. v. Williams*, 280 S.W. 689, 692 (Tenn. 1926) (relaying "[a] man cannot have an easement in his own lands[")]; *Branham v. Metro.*

---

[3] Despite the fact that the trial court discussed three sections of the GTLA in its order, Riverland failed to cite to any GTLA statute in its brief.

[4] The City disputes that it has an easement and/or right-of-way over Riverland's Property. Because the question of whether the City holds an easement and/or right-of-way is not dispositive, and because the trial court did not answer this question, we will not address it in this Opinion.

*Gov't of Nashville-Davidson Cty., Tennessee*, No. M2015-00455-COA-R3-CV, 2016 WL 4566095, at *10 (Tenn. Ct. App. Aug. 30, 2016) ("A right-of-way is not an ownership interest"). Since an easement is not considered ownership and ownership is requisite to removing immunity under TCA Section 29-20-204(a), [Riverland] cannot remove [the City]'s immunity under this section. There was not an "injury caused by the dangerous and defective condition of any . . . public improvement owned and controlled" by the City of Jackson.

Turning to the record, it is clear that the City did not own the Property and was not involved in the MSBP's construction. Scott Chandler, who oversees the City's Engineering Department, stated in his affidavit, which was attached as an exhibit to the City's motion for summary judgment:

9. Based on the City's records and practices, the City was not involved in the design or construction of [the] MSBP or the building on the Property. In particular, the City was not involved in the design or construction of the [d]itch or the [p]ipe. The City did not install the [p]ipe. The City does not own the [p]ipe or the [d]itch.

\*\*\*

11. After [the] MSBP was developed, per its policy and practice, the City accepted the streets in [the] MSBP, including the drainage improvements in the street's right-of-way. The City does not accept or agree to maintain the drainage structures and improvements that extend beyond the right-of-way. As an example, the City accepts and maintains the inlet drains on the edge of roads in [the] MSBP, but the City does not accept the pipes that run from the inlet to the rear of private property. The City's policy is akin to a sewer system. A utility provider accepts responsibility for the sewer up to the meter. As such, the line that runs from the meter to the home/building is the responsibility of the property owner.

In its response to the City's statement of undisputed material facts, Riverland admits that the City does not own the Property. However, Riverland alleges that the City is responsible for the metal drainage pipe because it was installed underneath the land where the City had an alleged utility and drainage easement and right-of-way.

An easement is "an interest in property that confers on its holder a legally enforceable right to use another's property for a specific purpose." *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998); *see also* *Fowler v. Wilbanks*, 48 S.W.3d 738, 740 (Tenn. Ct. App. 2000); *Pevear v. Hunt*, 924 S.W.2d 114, 115 (Tenn. Ct. App. 1996). However, "an easement is not an interest in the ownership of the underlying real

- 6 -

property." ***Gore v. Stout***, No. M2006-02111-COA-R3-CV, 2008 WL 450597, at \*11 (Tenn. Ct. App. Feb. 19, 2008). The Middle Section of this Court was faced with a similar issue in ***Yates v. Metro. Gov't of Nashville & Davidson Cty.***, 451 S.W.2d 437 (Tenn. Ct. App. 1969). In ***Yates***, a private firm developed land behind the plaintiffs' property; in 1962, the firm "built streets, laid water lines, and built a pumping station near [the] plaintiffs' southwest corner." ***Id.*** at 439. A twenty foot utility easement, which was made into a driveway, extended from the pumping station to the street. ***Id.*** A ditch or ditches surrounding the driveway intercepted the flow of surface water and diverted the water onto the plaintiffs' property. ***Id.*** Post-development, the pumping station and pipes in the subdivision were conveyed to Nashville Suburban Utility District ("Utility District"). ***Id.*** Later, the Utility District used the driveway for access to the pumping station, but never altered it. ***Id.*** In 1964, the Department of Water and Sewage Services of the Metropolitan Government of Nashville and Davidson County ("Metro") acquired the entire operations of the Utility District. ***Id.*** Metro used the driveway, but did not alter it. ***Id.*** In 1964, the plaintiffs experienced flooding of their house after a heavy rain. ***Id.*** The plaintiffs argued that Metro was liable for their flood damage because, *inter alia*, Metro was "obligated to maintain the easement because it was 'held by the municipality' in trust for the public." ***Id.*** at 441. Thus, the issue presented to the Middle Section was:

> Is a municipal corporation liable for damages where it is operating a water system in an easement dedicated to the public for that purpose where the surface of the easement constitutes a nuisance and damages a neighboring property owner when it appears that the original condition of the easement exists because of the prior acts of third persons who may or may not be contractually related to the municipal corporation.

***Id.*** at 440.

The Middle Section concluded that Metro was not liable for the plaintiffs' water damages. In reaching this conclusion, the Middle Section discussed easements and the rights given to one who holds an easement. The Court explained that "[a]n easement does not consist of a quantity of land, but merely the privilege to pass over certain land. Thus[,] the use of an easement does not entail general supervision or maintenance of the land over which it passes, but only to such extent as is necessary for the exercise of the privileges of the easement." ***Id.*** at 440-41. The Court further explained that

> [t]he holder of an easement has the right to use or alter the affected premises only as reasonably necessary for the use of the easement. Such holder has no right to exclude others from the use of or alteration of the premises so long as there is no interference with the easement privilege. For this reason, the holder of an easement could not be reasonably required to perform any maintenance, repairs or alterations upon the property over which the easement exists, unless such holder has made such maintenance,

repairs, or alterations necessary by the manner of [h]is use of the easement. Specifically, the Utility District and its successor, [Metro], had the right to come and go along the driveway, but they had no right or obligation to make any repairs or changes in the real estate unless their use of the easement made such repairs or changes necessary.

\*\*\*

A sound[] rule . . . that [has been] employed in the many authorities which have been studied, is that the holder of the easement is responsible for proper maintenance of [w]hat he puts on the easement to facilitate his use of the easement.

*Id.* at 441.

Assuming, *arguendo*, that the City held an easement, the City had the right to use the easement but had no obligation to make repairs or changes along the easement unless its use of the easement made the repairs or changes necessary. Riverland cannot show that the City actually used the easement, much less that it caused the drainage pipes to need repairs. To the contrary, Riverland's entire argument is that the City abandoned the downstream drainage structure and easement. Riverland's argument centers around the City's inactivity. Because the City never took any action concerning the drainage structures, the City was not required to maintain the pipes.

Riverland also argues that because the pipes carry public storm water, the City is responsible for the drainage infrastructure. This issue was also addressed in *Yates*, to-wit:

Plaintiffs cite many authorities for the proposition that certain easements are held by certain public corporations for the public use, and that such public corporations are responsible for the "maintenance of the easement." None of such authorities are in point for the reason that none holds that a public utility which uses a utility easement over land thereby undertakes to remove from such land any nuisance placed thereon by other and previous users.

Plaintiffs insist, and cite many authorities for the proposition that [the] owner of an easement must "keep it in proper condition" or "keep it in repair," but these authorities deal with situations wherein the holder of the easement has an exclusive right to control of the property, or where improvements or alterations are made by the holder of the easement as an incident to the easement. It is the facilities of the easement, rather than the ground itself which must be "kept in repair" by the holder of the easement.

In the present case, it is not shown that the ditches were facilities of the easement, that is, that they were a necessary incident to the usefulness of the easement, nor that the defendant herein had neglected to repair or maintain them. On the contrary, plaintiffs insist that i[t] was the duty of defendant to remove them.

Plaintiffs' insistence in this regard is stated in their brief as follows:

". . ." the access road built on the dedicated easement was done so through apparent necessity to obtain the use for which the easement was dedicated, that is, so that heavy equipment could reach the pump house located at the bottom of the steep hill and easement. It is the position of the plaintiff-in-error that once such a road was built, it was the duty of the owner to maintain the road in such a manner that it did not become a nuisance and consequently damage plaintiff-in-errors' land ". . . ."

Such insistence pre-supposes, without support in the evidence, that the ditches were a necessary part of the road as used by defendant, that there was some failure of defendant to "maintain" the road or ditches so that it, or they, "became a nuisance." To the contrary, all of the evidence indicates th[a]t the "nuisance" or diversion of wat[]er was created by Estes-Taylor before defendant Metro. or its predecessor, the Utility District, made any use of the easement. There is no evidence that the District or Metro., by any negligence allowed the road or ditches to [b]ecome a nuisance.

*Id.* at 442.

Similarly, the evidence in our case indicates that the diversion of water onto Riverland's Property was created when the MSBP was developed, which was before the City could have used the easement. There is no evidence that the City was negligent in regard to the drainage structures, or that the City allowed the pipes to become a nuisance. In *Yates*, the Middle Section explained that "[n]o authority ha[d] been cited or found which holds the user of an easement liable for failure to remove from the territorial bounds of the easement a nuisance which was placed or created thereon before such user began to use such easement." *Id.* at 443. The Court continued, concluding that there was no evidence that Metro or its predecessor "performed any construction work or in any manner created the situation complained of by plaintiffs." *Id.* Here, there is no evidence that the City performed any construction work or, in any manner, created the situation complained of by Riverland. Therefore, we agree with the trial court that the City did not own the drainage structures, and that an easement (if same exists), and/or right-of-way do

not constitute ownership such that the City's immunity would be removed under Tennessee Code Annotated section 29-20-204(a).[5]

## 2. T.C.A. § 29-20-205:  Negligent Acts or Omissions

### i.  Discretionary Decision

Under Tennessee Code Annotated section 29-20-205(1),

[i]mmunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:

> (1) The exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused;

Tenn. Code Ann. § 29-20-205(1).  The term "discretionary function" is not defined in the GTLA.  However, the Tennessee Supreme Court articulated the test for determining whether an act is discretionary in *Bowers by Bowers v. City of Chattanooga*, 826 S.W.2d 427 (Tenn. 1992), to-wit:

> Under the planning-operational test, decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational are not considered discretionary acts and, therefore, do not give rise to immunity. *See Carlson v. State*, 598 P.2d 969, 972 (Alaska 1979).  The distinction between planning and operational depends on the type of decision rather than merely the identity of the decision maker. *See id.*  We caution that this distinction serves only to aid in determining when discretionary function immunity applies; discretionary function immunity attaches to all conduct

---

[5] Riverland also argues that, because the City violated the natural flow rule, it should be held responsible for Riverland's drainage issues.  The natural flow rule states:

> If the owner of higher lands alters the natural condition of his property so that surface waters collect and pour in concentrated form or in unnatural quantities upon lower lands, he will be responsible for all damages caused thereby to the possessor of the lower lands.

*Zollinger v. Carter*, 837 S.W.2d 613, 614-15 (Tenn. Ct. App. 1992) (internal citations omitted).  There is no evidence that the City owns or owned higher lands, which it altered, or that it caused surface waters from higher lands to collect on Riverland's lower land such that the City should be held responsible for the damages.  Therefore, the natural flow rule is inapplicable to this case.

properly involving the balancing of policy considerations.

*** 

Under the planning-operational test, discretionary function immunity does not automatically attach to all acts involving choice or judgment. Such an analysis recognizes that, to some extent, every act involves discretion. Rather, the underlying policy of governmental immunity is better served by examining (1) the decision-making process and (2) the propriety of judicial review of the resulting decision. *Cf.* ***Peavler v. Board of Commissioners***, 528 N.E.2d 40, 46 (Ind. 1988) (examining the nature of the conduct, its effect on governmental operations, and the capacity of a court to evaluate the decision).

A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules. *See* ***id.***

On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies. These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. In other words, "the discretionary function exception [will] not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation." ***Aslakson v. United States***, 790 F.2d 688, 692 (8th Cir. 1986).

Another factor bearing on whether an act should be considered planning or operational is whether the decision is the type properly reviewable by the courts. The discretionary function exception "recognizes that courts are ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision" and therefore allows the government to operate without undue interference by the courts. *See* ***Wainscott v. State***, 642 P.2d 1355, 1356 (Alaska 1982). Put succinctly:

- 11 -

> [T]he judiciary confines itself . . . to adjudication of facts based on discernible objective standards of law. In the context of tort actions . . . these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not [reasonableness] but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.

*Peavler*, 528 N.E.2d at 44-45 (quoting *Blessing v. United States*, 447 F.Supp. 1160, 1170 (E.D. Penn. 1978)).

*Bowers*, 826 S.W.2d at 430-31.

Riverland argues that the City is negligent because it failed to maintain or repair the metal drainage pipe. In order to determine whether the City was immune, under Tennessee Code Annotated section 29-20-205(1), we must determine whether the City's policy not to maintain and repair drainage pipes located on private property is a planning decision or an operational decision. The trial court found:

> In this instance, the decision to not maintain the drainage pipe on [Riverland]'s property constitutes a planning decision. The [C]ity, as a matter of policy, does not maintain drainage pipes located on private property. In addition, a government entity has no obligation to maintain drainage ditches on private property. *See Britton v. Claiborne Cty.*, 898 S.W.2d 220, 223 (Tenn. Ct. App. 1994). In so choosing to not maintain the pipes located on private property, the City of Jackson is making a decision to allocate its finite resources only to ditches that are owned by the [C]ity, therefore making the decision a discretionary one. Moreover, the court is ill-equipped to determine the soundness of the City's policy. As a result, the government should be allowed to act without "undue interference by the court[]." *Id.* Therefore, with regard to TCA Section 29-20-205(1), the [c]ourt finds that [Riverland] failed to establish that immunity should be removed, since [the City]'s decision not to maintain the drainage ditch constitutes a discretionary function under TCA Section 29-20-205(1) and the planning-operational test used by Tennessee courts.

Turning to the record, in his affidavit, Mr. Chandler testified, in relevant part, that:

12. The City's general policy is that no repair or maintenance work is performed on drainage improvements on private property and that the City did not build or install. The City lacks the manpower and financial resources to maintain and repair all private drainage structures. The City

lacks the financial resources to both pay for all the repair and maintenance work and to hire the necessary employees to perform the work.

13. Per its policy, the City has not maintained the [d]itch or the [p]ipe. No work has been performed on the [p]ipe or the [d]itch by the City. The City has not performed any repair or maintenance on the [p]ipe or the [d]itch because they are on private property and were not designed or constructed by the City.

In response to the City's assertion that its policy is not to repair or maintain drainage improvements on private property, which the City did not build or install, Riverland cited the following from the City of Jackson Engineering Department's website:

**Who is responsible for maintaining storm water drainage on my property?**

*Responsibility lies with the property owner, often the property line is the center of a ditch in which case each adjacent property owner is responsible for their half. If there is underground stormwater infrastructure (pipes) that carries "public" water, the City is responsible unless the system was damaged by the property owner.*

When asked, during his deposition, about this statement on the Engineering Department's website, Mr. Chandler explained that the City recently redesigned its website and, in doing so, transferred old information onto the new website. Mr. Chandler stated that he did not write the answer to that question, and that the information in the answer was incorrect and not aligned with current policy and procedure. Therefore, after the answer was brought to Mr. Chandler's attention, the website was revised.

Riverland also relies on the deposition testimony of Mr. George Barnes, the City's Superintendent of Stormwater Operations, to show that the City had previously repaired or replaced storm water drainage pipes located on private property that convey public water:

**Q:** Is it the City's policy to or was it in 2014 -- to repair or replace stormwater drainage pipes that are located underground on private property that convey public water?

**A:** I don't make policy or have any dealings with policy.

**Q:** Well, have you, as the Stormwater Superintendent of Stormwater Operations, have you, or your crew, sent out employees with the City of

- 13 -

Jackson to repair or replace stormwater drainage pipes that are located on private property that convey public water before?

**A:** Yes, sir.

Importantly, Mr. Barnes admitted that he does not participate in developing the City's policy regarding drainage structures on private property. Simply because he sent a crew to repair or replace storm water drainage pipes that are located on private property does not establish that this is the City's policy. Although Mr. Barnes admitted that in the past he sent someone to perform maintenance work on private property, he did not admit that his unilateral decision was consistent with the City's policy. On the contrary, this use of a city crew for such work was in contravention of the City's policy, as explained by Mr. Chandler in his affidavit. Additionally, Mr. Barnes explained that, to his knowledge, the City had never performed maintenance on the drainage structures on the Property.

Despite the dispute as to the City's stated policy, as is relevant to removal of GTLA immunity, Riverland presented no evidence to demonstrate that the City's policy (whatever it is) is an operational decision. Specifically, Riverland presented no evidence to refute Mr. Chandler's affidavit on this issue. Mr. Chandler explained that the reason for the City's policy is that the City "lacks the manpower and financial resources to maintain and repair all private drainage structures." Accordingly, the decision to create this policy resulted from "assessing priorities" and "allocating resources." *Bowers*, 826 S.W.2d at 431. This fact demonstrates that the policy was the result of a decision-making process; as such, the City's policy is a planning or policy-making decision. *See id.* Therefore, the policy is a discretionary act for which immunity is not removed. *See id.* As both the *Bowers* Court and the trial court articulated, we recognize that we are "ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision" and we should allow the City to operate without our undue influence. *Id.* (quoting *Wainscott*, 642 P.2d at 1356). From the record, we cannot conclude that the City's immunity is removed under Tennessee Code Annotated section 29-20-205(1).

### ii. Issuance of Building Permits

Under Tennessee Code Annotated section 29-20-205(3),

[i]mmunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:

> (3) The issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar

- 14 -

authorization;

Tenn. Code Ann. § 29-20-205(3). Turning to the record, the trial court concluded:

> . . . [The City] cannot be held liable for the issuance of building permits for the development of [Riverland]'s land or for the development of the surrounding parcels. TCA Section 29-20-205(3) states that immunity is not removed for negligent acts if the injury arises out of "[t]he issuance [. . .] of [. . .] any permit [. . .]." While the [C]ity may have issued building permits that left inadequate drainage on [Riverland]'s property, this cannot be a basis for liability.

Riverland relies on its expert, Mr. Kevin Gangaware's, affidavit testimony for its argument that the City "consented to the partial abandonment and relocation of its drainage infrastructure." Specifically, Riverland argues that because the City consented to the relocation of the drainage infrastructure, it should be responsible for it. It appears from the exhibits attached to Mr. Gangaware's affidavit that the City's "consent" to the "partial abandonment and relocation of its drainage infrastructure" was simply the City approving the MSBP's construction plat. The exhibits demonstrate that the City did not develop the MSBP. Rather, private developers developed the MSBP with the help of private consultants and a private construction company. As specified in Tennessee Code Annotated section 29-20-205(3), the City retains immunity for "injury proximately caused by a negligent act or omission . . . [that] arises out of . . . the issuance . . . of . . . any permit, license, certificate, approval, order or similar authorization." Tenn. Code Ann. § 29-20-205(3); *see* **Miller v. City of Brentwood**, 548 S.W.2d 878, 883 (Tenn. Ct. App. 1977) ("[N]o right of action is recognized against a municipality for issuing a permit for construction in accordance with existing laws and regulations."). Therefore, the City's immunity is not removed merely because it approved the MSBP's construction plat.

Because the City's immunity is not removed under the GTLA, we affirm the trial court's grant of summary judgment as to the tort claims of negligence, including gross negligence, willful and reckless conduct, nuisance (both temporary and permanent), and trespass.

## B. Inverse Condemnation

Riverland also appeals the trial court's grant of summary judgment as to its inverse condemnation claim. Riverland brought this claim under Tennessee Code Annotated section 29-16-123, *et seq.* and Article I, section 21 of the Tennessee Constitution. The Tennessee Supreme Court discussed inverse condemnation claims in **Edwards v. Hallsdale-Powell Util. Dist. Knox Cty., Tenn.**, 115 S.W.3d 461 (Tenn. 2003), to-wit:

The Tennessee Constitution states that "no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor." Tenn. Const. art. I, § 21. This constitutional provision recognizes the governmental right of eminent domain. The government is prohibited, however, from taking property for private purposes and must pay just compensation when property is taken for public use. *See Jackson v. Metro. Knoxville Airport Auth.*, 922 S.W.2d 860, 861 (Tenn. 1996). The Tennessee General Assembly has implemented this provision by its passage of eminent domain and inverse condemnation statutes. *See* Tenn. Code Ann. §§ 29-16-101 to 29-16-127; 29-17-101 to 29-17-1202.

"Inverse condemnation" is the popular description for a cause of action brought by a property owner to recover the value of real property that has been taken for public use by a governmental defendant even though no formal condemnation proceedings under the government's power of eminent domain have been instituted. *See Johnson v. City of Greeneville*, 435 S.W.2d 476, 478 (Tenn. 1968). A "taking" of real property occurs when a governmental defendant with the power of eminent domain performs an authorized action that "destroys, interrupts, or interferes with the common and necessary use of real property of another." *Pleasant View Util. Dist. v. Vradenburg*, 545 S.W.2d 733, 735 (Tenn. 1977). Not every destruction or injury to property caused by governmental action, however, constitutes a taking under article I, section 21 of the Tennessee Constitution. *See Jackson*, 922 S.W.2d at 862 (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980)). Tennessee courts have recognized two classifications of takings: physical occupation takings and nuisance-type takings. *See id.* at 862-63.

*Id.* at 464-65. It is unclear whether Riverland alleges a physical taking or a nuisance taking. However, this question is not dispositive of the issue because "to constitute a taking under either [type,] . . . some action on the part of the governmental defendant is required." *Id.* at 466. Further, the governmental defendant's action must be purposeful or intentional and must result in damage to a plaintiff's real property. *Id.* at 466-67. Accordingly, the first question is whether the City performed a purposeful or intentional act that resulted in damage to Riverland's Property.

Respectfully, the trial court's order on inverse condemnation conflates the appropriate analysis for the inverse condemnation claim with the appropriate analysis for the discretionary function exception under the GTLA, to-wit:

. . . I don't think that it's an intentional act to approve the design. I think

- 16 -

that goes back to the whole operational versus – I don't remember the two tests. Discretionary – or operational versus planning, is that it? So it's a discretionary – under those – so that makes it a discretionary which does not remove immunity.

I just don't see – I can't get there. So I don't think there's an intentional act. I don't think that's been proven. I think that's just a decision the [C]ity has immunity for. So having that – I think if I remember from the other order, having an easement does not remove that immunity under the case law. . . .

So I'm going to grant the motion for summary judgment on the inverse condemnation on that basis.

The GTLA does not apply to inverse condemnation claims. Tenn. Code Ann. § 29-20-105 ("This chapter shall not apply to any action in eminent domain initiated by a landowner under §§ 29-16-123 and 29-16-124 nor be construed to impliedly repeal those statutes."). Therefore, the discretionary function test, discussed *supra*, is inapplicable to inverse condemnation claims. Despite confusing the two issues, we conclude that the trial court correctly granted the City's motion for summary judgment regarding Riverland's inverse condemnation claim. We "may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *Kirk v. Kirk*, 447 S.W.3d 861, 873-74 (Tenn. Ct. App. 2013) (citing *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *Shutt v. Blount*, 249 S.W.2d 904, 907 (Tenn. 1952); *In re Estate of Jones*, 183 S.W.3d 372, 378 n. 4 (Tenn. Ct. App. 2005); *Shoemake v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 577 (Tenn. Ct. App. 2003)).

Turning to the record, Riverland relies on Mr. Gangaware's affidavit to show the City's purposeful and intentional acts. Specifically, Riverland claims that the City "partially abandoned [a] downstream drainage infrastructure, and consented to its relocation—which changed the natural surface water flow on the vacant lot immediately west and downstream from the Property in 1975 just before Madison Square was platted . . . ." Riverland argues that this act caused the public storm water to drain in a different direction, which led to the flooding of the Property. As discussed, *supra*, when the City "consented" to changing the drainage infrastructure, it was merely approving the construction and development of the MSBP. Again, the City did not develop the MSBP, nor did it construct the drainage infrastructure within the MSBP. Contrast our case with *Branham*, 2016 WL 4566095, another Court of Appeals case. In *Branham*, this Court concluded that the Metropolitan Government of Nashville-Davidson County, Tennessee's ("Metro") actions of clearing a ditch for the purpose of cleaning and redefining the storm water ditch was purposeful and intentional. *Id.* at *6. Here, however, the City has taken no action with regard to the drainage infrastructure on Riverland's Property other than approving the construction. We cannot conclude that simply approving a construction

- 17 -

plat is tantamount to a purposeful and intentional act such that the City should be responsible for Riverland's damages under an inverse condemnation claim. Therefore, while the trial court erred in its inverse condemnation analysis, we agree with its conclusion to grant the City's motion for summary judgment as to that claim. *See Kirk*, 447 S.W.3d at 873-74.

### C. Equitable Relief

Riverland also appeals the trial court's grant of summary judgment as to its nuisance claim on which it sought equitable relief. A nuisance "extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property." *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981). This Court explained the different types of nuisance claims in *Peterson v. Putnam Cty.*, No. M2005-02222-COA-R3-CV, 2006 WL 3007516 (Tenn. Ct. App. Oct. 19, 2006). Essentially, a plaintiff seeking damages against a governmental entity under a nuisance claim must travel under the GTLA. *Id.*, at *11. However, "an equitable action to abate a nuisance created by a governmental entity is permitted outside [the] terms of the GTLA." *Id.* (citing *Paduch v. City of Johnson City*, 896 S.W.2d 767, 772 (Tenn. 1995) ("A cause of action under the [GTLA] may lie for activities of a governmental entity for which immunity has been waived even though such activities may also be the basis for the equitable action to abate a nuisance."); *Jones v. Louisville & Nashville R.R. Co.*, No. 85-134-II, 1986 WL 3435, at *3 (Tenn. Ct. App. Mar. 21, 1986) ("There is nothing in the [GTLA] which removes the inherent power of a court of equity to abate a nuisance created by a governmental entity.")). For Riverland to establish the City's liability under nuisance, it must demonstrate the following: (1) an inherently dangerous condition; and (2) an affirmative action by the City. *Dean v. Bays Mountain Park Ass'n*, 551 S.W.2d 702, 704 (Tenn. Ct. App. 1977); *see also Paduch*, 896 S.W.2d at 771.

The trial court granted summary judgment as to Riverland's equitable nuisance claim on the basis that the GTLA applied and immunity was not removed. Respectfully, this was error. Riverland's equitable nuisance claim was not subject to the GTLA. *Peterson*, 2006 WL 3007516, at *11. However, in its brief to this Court, Riverland's only discussion regarding its nuisance claim for equitable relief is that the trial court erred when it held that the GTLA applied to this claim. Riverland did not argue that there was an inherently dangerous condition, or that the City took any affirmative action. The City, however, argued that the undisputed proof demonstrated that there was no affirmative act by the City. We agree. As discussed, *supra*, the City did not build or develop the MSBP or the drainage structures at issue. The City was not responsible for the maintenance of the drainage structures, nor did it undertake to maintain them. Therefore, the City took no affirmative action. Consequently, while the trial court erred in its analysis regarding Riverland's claim for equitable relief, it reached the correct result in granting the City's motion for summary judgment as to this claim. *See Kirk*, 447 S.W.3d at 873-74.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Riverland, LLC, and its surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE